# Thompson *versus* Kyner.

1. An abnormal condition of mind is never presumed when a testator makes a will, unless a previous aberration be shown of such a nature as may admit of a presumption of recurring unsoundness at any time.

2. Each case as to incapacity is, to a great extent, to be tested by its own facts and circumstances.

3. Old age, failure of memory or habitual drunkenness, will not *per se* constitute incapacity to make a will.

4. The test of capacity is, that the testator's mind and memory were sufficiently sound to enable him to know and understand the business in which he was engaged at the time he executed his will.

5. Weakness alone will not invalidate a will, if there be mind and memory enough to understand the subject in hand and to direct the disposition of the property intelligently.

[Thompson v. Kyner.]

6. The test of this is to be of the time when the will is made including some latitude of proof, before and immediately, as distinguished from remotely, after.

7. Undue influence may be either through threats or fraud and must destroy the free agency of the testator, at the *time* when the instrument is made.

8. Declarations as to the incapacity of a testator by a party sustaining the will, were properly rejected, when the offer was made without limitation as to time, place and circumstances of making them.

9. Proof is admissible to rebut a material presumption.

10. As a general proposition less capacity is sufficient to make a valid will than to transact ordinary business.

11. The rule as to incapacity and undue influence in McMasters v. Blair, 5 Casey 298, Daniel v. Daniel, 3 Wright 191, Storms v. Vancleve, 4 W. C. C. R. 262, Eckert v. Fleury, 7 Wright 46, adopted.

May 10th 1870. Before THOMPSON, C. J., AGNEW and SHARS-WOOD, JJ.

Error to the Court of Common Pleas of *Franklin county :* No. 70, to May term 1870.

This was an action of ejectment, brought March 24th 1868, for two tracts of land in Franklin county, by Mary Thompson and others, heirs of George Kyner, deceased, against Alexander W. Kyner. The defendant claimed as devisee of the decedent; the plaintiffs alleged that the will was invalid by reason of the incapacity of the decedent and undue influence exercised over him by defendant. The will had been contested in an issue directed by the Register's Court, and a verdict rendered sustaining the will. The decedent died in July 1867, aged about 92 years, leaving a widow, Mary Kyner, seven children, including the defendant, and six grandchildren, children of Margaret, a deceased daughter, who died after the date of the will.

The will was dated June 28th 1855, and established by the verdict in the feigned issue, February 12th 1868. The testator gave to his wife one-third of his personal property absolutely, and one-third of the rents, &c., of his real estate for life. He gave to each of his children, except the defendant, $400, the first payable in four years after his death, and the payment of others successively each in one year after the preceding; the last being in ten years after his death. He gave all his real estate to his son Alexander, and charged it with the bequest to the widow and the legacies to his brothers and sisters; he gave him also the residue of his estate and appointed him executor of his will. The will was admitted to be in the handwriting of James S. Ross, Esq., who died in October 1864. The widow elected to take under the intestate laws. She was called by the plaintiffs, and testified that the defendant had farmed his father's farm to the shares from about 1850. The decedent previously to that, had become security to a large amount for a man named Wharton, who failed in 1849, and the decedent had been compelled to pay a large amount on account of these

15 P. F. SMITH—24

[Thompson *v.* Kyner.]

liabilities; after that he " became weak-minded, and not able to attend to business." Afterwards the defendant attended to his business; he never settled with his father, but with the witness; they had settlements in the presence of the decedent; he took no part in them: was hard of hearing; his interest in his business decreased as he grew older; the defendant did not ask that the decedent should be present; he became paralyzed about seven years before his death; had symptoms of paralysis in 1855; was weak and sick, and slept a good deal.

The plaintiffs proposed to prove by this witness:—

That for several years prior to the date of the paper in dispute and up until the death of George Kyner, the defendant assumed to himself the entire control and management of his business. That he conducted and controlled all the work and business that were performed upon the farm. That he sold the products thereof —paid expenses of conducting the farm, and paid outside debts of George Kyner. That George Kyner during all this time had entirely surrendered the control and management of his affairs to the defendant and the witness. That during all this period all settlements for the products of the farm, and the accounts between the defendant and his father were settled with the witness—without any interference, objection or remark on the part of the father. That he was frequently present on the occasion of these settlements, but took no part, and exhibited no concern or interest therein. That the farm was a productive one, and these settlements embraced accounts to the amount of $800 or $900 on an average every year. That this indifference and want of attention to these matters grew out of the mental imbecility and weakness of the father. That frequently in these settlements, the witness would remark, that they (that is the witness and the defendant) must be careful to make accurate settlements for they were transacting business for orphans—the father being for all business purposes the same as a dead man. And that the defendant would assent to this remark by the witness that this was true, and that the defendant frequently on the occasions of the settlement, and at other times admitted to the witness, that his father had not mind enough to transact his own business.

Parts of the offer were objected to by the defendant. The court rejected the offer, except so far as it relates to time prior to the execution of the will, or to the time of the execution, or within a short period after, and sealed a bill of exceptions.

The witness proceeded:—Before the date of the will the defendant said the decedent was not fit to attend to business; people could persuade him to do anything; witness thought decedent not fit to make a will in 1855; decedent told witness several times after 1855 that he had not made a will. After decedent's death witness told defendant he ought to administer the estate, and

[Thompson *v*. Kyner.]

should ask Mr. McLain to unite with him; he said he would go, but on his return said he had not seen McLain, but had gone to Chambersburg to see what he would have to do. Witness said that was strange; defendant hesitated a moment, and said, " Mother, there is a will, written twelve years ago," that witness was left well off, each of the heirs got $400—and defendant got the farm. Witness said, " You and Ross made the will, and got your father to sign it. He just stood and made no answer." Witness asked him how he knew there was a will? he said that in the street in Chambersburg he met Clarke, who told him there was a will.

Joshua Kennedy testified : In the middle of June 1855, about 1½ o'clock P. M. of the day, he met defendant coming out of Mr. Ross's office in Chambersburg. Witness went in, decedent was sitting at his table. Mr. Ross was writing. Witness went out, and returned at 4 o'clock, and Mr. Ross said he had just been writing decedent's will. This witness testified to facts tending to showing the decedent's incapacity.

The plaintiffs proposed to show by this witness that from 1855 until testator's death, his mind was weak and imbecile, and unfit for the transaction of business, and that this unfitness extended through the whole period.

The offer was rejected by the court and a bill of exceptions sealed.

Mrs. Ross, the widow of James S. Ross, testified, that after her husband's death she had given the will to Lyman S. Clark, Esq. The defendant had called on witness and asked about the will; told her to keep it safe, and let no one know about it.

Lyman S. Clark testified that the defendant came to the witness with Mr. Hayes, his counsel, and asked him if he had the will; witness did not meet defendant on the street and tell him that he had the will.

The plaintiffs examined many witnesses, who gave testimony tending to show the decedent's incapacity, influence exercised over him by the defendant, and that his mind was so weak that he could be easily persuaded to make the will he did.

The defendants examined a great many witnesses, who testified that before and at and about the time of the date of the will, the decedent had capacity to make a will; that he gave attention to his affairs, that the defendant consulted his wishes, &c. He testified that he had not been at Mr. Ross's office, nor even in Chambersburg on the day the will was prepared. There was other evidence also to the same effect.

The plaintiffs recalled Joshua Kennedy, who testified :—

" I had a conversation with James S. Ross on the day he told me the will was written. It was in his parlor after tea. After he made the statement that he had written Mr. Kyner's will, I told him the condition of Mr. Kyner's mind at the time I last

[Thompson *v.* Kyner.]

saw him, three or four weeks before, which was as I gave it here. He stated that Mr. Kyner's mind was confused during the time he was writing the will. I spoke of the vacillation of Kyner's mind. He said Mr. Kyner's mind was excited when the will was writing. He remarked that he would take that will and keep it in his own hands. That was the substance of the conversation."

The plaintiffs submitted a number of points, of which the 6th was :—

If the jury believe that Mr. Ross, on the evening that the will was made, told Rev. Joshua Kennedy that he observed that Mr. Kyner's mind was confused and excited whilst he was making his will, and that he would retain the will in his own possession, this evidence is of grave importance in estimating the actual fitness of Mr. Kyner then to dispose of his estate.

The court (Rowe, J.) answered, "We affirm all these propositions, the last being modified by what we have said in the general charge."

The 10th and 12th points of the defendant were :—

10. That it requires a greater degree of mental capacity to execute a contract than it does to make a valid last will and testament.

12. That the attestation of said instrument by James S. Ross, Esq., and James L. Black, Esq., the proof of the handwriting of the said James S. Ross, and the testimony of the said James L. Black, as well as the fact that said James S. Ross retained the same in his custody for a period of seven years and more, are all facts and circumstances entitled to great weight with the jury in the determination of this cause, and there is nothing in the declaration of James S. Ross, Esq., as stated by Rev. Joshua Kennedy, inconsistent with this position.

These points were affirmed in the general charge.

Judge Rowe, after recapitulating the admitted facts, &c., charged :—

* * * "This brings us to the consideration of what constitutes mental capacity to make a will. What amount of mind and memory must a testator possess? What is that mental imbecility which disqualifies to make a will? For this is a case of *senile dementia,* mental weakness arising from old age, the decay of the mental faculties following the loss of bodily vigor and vitality. We are not concerned in this investigation with questions of insanity, properly so called. This is not a case of delusion taking hold of a vigorous mind, but of a loss of mental power; not of an irregular working of the machinery of the mind, but of a ceasing to work with sufficient power.

"It is supposed by some that capacity to make a contract or transact ordinary business, is the criterion of fitness to make a will, but it is not so. [Much less than this is sufficient in most

[Thompson v. Kyner.]

cases, and certainly in the case of a simple will like this one in question, where a testator gives his wife what the law gives her, $400 to each of his children—except one, and to him the remainder. To make such a disposition of one's estate would require but little reflection and memory.]

"It has been supposed also, that a sound and disposing mind and memory consists in the testator's 'ability to reflect upon his business affairs,' understand the nature of what he is doing, with a recollection of all his estate, his family relations in life, as well as their condition in general, and the probable effect the proposed disposition will have, and *to collect all this in one view.*' But the Supreme Court has said that this is requiring too much; that it is sufficient if he understands in detail what he is about.

"It is not probable that many place the standard of testable capacity so high as to require the testator to be able to understand theological problems or the requisites of a particular sect to a proper preparation for death. Nevertheless it is proper for us to say that this is no proper test. [It would be exceedingly dangerous to say the mind must be steady, coherent and retentive. It is a trinity not spoken of in any of the books."] * * *

["It is in evidence from the mouths of witnesses whose character for veracity is not impeached :—

"That he conversed intelligently of the purchase of a farm adjoining his own, bought by Mr. Cressler, of the payments and all about it, in 1854, and Mr. Cressler saw no change in his mental condition in June 1855, when Alexander's barn was raised. In 1853, it would seem, he got Mr. Heck to lift a judgment at Chambersburg, that another judgment might come in first, and then gave him a second judgment a day or two after at Shippensburg. In 1855 he got John Johnston to endorse for him, in giving and renewing notes in bank. Henry Hollar had dealings with him in 1855. Sold him goods and bought cattle of him. Says he was a man of sound mind, fit to make a bargain, careful in buying and selling, as hard to deal with as another. In 1855 he took vessels to Samuel Boher, at Shippensburg, a cooper, and left a balance of account stand a few days, and came back and paid it. In 1855 he dealt so closely with Hugh Smith, that Smith could not buy. In 1854 he asked what the Eastern market might afford, but not the home market. He paid Smith his taxes after being threatened with a levy. In 1854 he refused Henry Stouffer corn, until he should ascertain the state of his accounts with Alexander. Said he would tell Alexander, and a day or two after the corn came. In 1851 he acted for David Hays as an appraiser, and the business was properly done. In 1855, just about the time perhaps that this will was executed, or after, for it was when Alexander's barn was *painted* by Samuel Winters, and it seems to have been

[Thompson *v.* Kyner.]

*raised* in June, Winters made a *contract* with the old gentleman for the painting of his barn. He says, we got to bargaining; George Kyner asked me what I would take to do the job, and what I would do it for by the day, and what material it would take. I told him, and bargained with him. He drove his bargain as close as ordinary men. In a bargain he was as sound as any man I got hold of. On the 10th of May 1855, a month or two before the making of the will, he was at the house of Charles M. White, for several hours. He came on foot, from his son-in-law Duncan's, he said, where he had been *over night*, a distance of four miles. He said he went down to see about their situation; that his daughters had all married well, except the one in the West—Margaret, whom he spoke of as being dead, and her children having been brought in and being well provided for. Said it was a fine thing to have sons that could take the care off fathers. Add to this, the testimony of Michael Lenher, Conrad Plasterer, John Dick, Daniel C. Miller, Peter Creamer—to whom he paid $100 in the field, on March 31st 1855—Jacob Harclerode, David Oaks, Jeremiah Angle, James Shirk, with all of whom he had business transactions, and with most of them in 1855, it would appear, óf greater or lesser importance, and who say he was fit to do business and of sound mind.

" This, taken altogether, presents a volume and force of testimony which, in our opinion, is irresistible in favor of the competency of the testator to make the will he did.]

" And when this is supported by many other witnesses, especially those who worked at the barn of Alexander, and who ate and slept in the house with George Kyner, after the date of the will and just before its date; the fact also of the two witnesses who were present at the execution of the will testifying to his competency at the time, for such we think Mr. Ross must be understood as doing, notwithstanding his declarations, and the declination of Dr. David Kyner, and Mrs. Marshall, two of the plaintiffs, whose conduct on the stand impressed us very favorably, to say more than that, in 1855, their father was in a state of mind to be easily influenced, in reply to a distinct question of whether he was fit to make a will.

[" The declarations of the witnesses on the other side that he was childish, lost his subject, talked of hunting, and of bees, once looked wild, once sat behind the stove and muttered to himself for a day or two when Alexander was away out West, bringing home the children of Margaret, and the weather was rough, of hunting on Sunday, and the sound of his gun reaching to Chambersburg, of his saying ' Grievous, Boy !' of his conversation going back to his early days, of his taking no part in the management of his affairs, of his sleeping a great deal, of his symptoms of paralysis in 1855, and the admissions of Alexander, the defendant, that he

[Thompson *v.* Kyner.]

was not fit to attend to business, weigh as nothing in the scale: for all this may be true, and yet the witnesses who tell us how he did business in 1855 not be mistaken.　He may have been dull and childish about many things, yet sufficiently wide awake upon the subject in which he was interested, when it was necessary for him to arouse up and exert himself.]" * * *

["I have said that Mr. James S. Ross, one of the subscribing witnesses to the will, must be taken to speak in favor of the competency of the testator at the time the will was executed, for when his attention was called the same evening by Kennedy to the fact that he thought his mind imbecile, in a conversation he had had a few weeks before, Mr. Ross merely stated that George Kyner— his client for years, whom he well knew, was excited and confused, and that he would hold his will in his own hands.　He did not say that his observation of him was the same as that of Mr. Kennedy; but the paramount fact remains, that lawyer as he was, and knowing presumably, that if he died his signature would stand for his oath in favor of George Kyner's competency, and his attention having been called to the necessity of inquiry as to that, he lived for seven years and died without declaring to wife or acquaintance that the will was void on account of Kyner's imbecility—and left it behind him to stand, a duly attested will.]　The will proved throws the *onus* on the plaintiffs to establish incapacity; but if incapacity is once established before the date of the will, the presumption is that it remains, and the defendant must show competency at execution.　This is all we have to say upon the question of mental competency.　We have observed fully upon the facts, because it seemed to us that the case called for it and you had a right to whatever aid we could afford; but we refer all the facts to you, to be applied to the principles of law expounded by the court." * * *

"Undue influence is some physical or moral coercion, which destroys the free agency of the testator at the time when the will is made.　Some constraint which substitutes the will of another for that of the testator; a present constraint which operates on the mind of the testator in the very act of making the testament.

"Any undue influence, past and gone, and in no way connected with the testamentary act, is not evidence to impeach a will.

"Less influence will be required to control a weak will than the will of one whose mind is in full vigor.　But neither moral nor physical restraint is to be inferred from mental weakness alone; that undue influence which suffices to destroy an alleged will is distinct from weakness, and has no necessary connection with it." * *

"The influence to render a will void must be intentionally exercised specifically to procure the testament in question.

"There must be pressure and contrivance to procure the will

[Thompson *v.* Kyner.]

to be made more favorably than was intended, on the part of the person who is charged with the exertion of the undue influence.

"Influence over the testator, arising from affection and regard on his part, however great it may be, which is general and operating at all times, will not in itself avoid a will. The influence resulting from habitual confidence or even deference on the part of the testator, inspired by affectionate attentions or important services, or high opinion of capacity, will not in itself be sufficient for that purpose, though the effect of that confidence or deference is visible in the will itself.

"But great affection on the part of the testator for the person charged with exerting the influence or fear of him, or confidence in him or deference for his superior judgment and capacity, especially in one of feeble mind, possessing little resistance, and who has, to a great extent, lost the power of self-direction, is a great fulcrum upon which to work the lever of influence.

"I may add that no argument, advice or persuasion will vitiate a will made freely, though it may have changed the testator's intentions. * * *

"If George Kyner's mind, from his many years and infirmities, bodily and mental, and from a long habit of depending upon his son for guidance, was though sane, but little self-directing or combative, and easily led into the channel of his son's suggestions, and if his son, the defendant, when the will was made, by the stamp of his firm mind on the weak and plastic will of his father, impressed there his wishes and views in regard to the disposition to be made by the will, and thus constrained the mind of the old man aside from the purposes he intended when relieved from the pressure of his son's influence, and so produced and procured such a will as his father would not otherwise have made, the will is not the free expression of George Kyner's intention, and must be set aside.

"But though you should believe the son had such power over the will of his father, that he could not resist the wishes of his son if pressed upon him, still if the son did not in fact bring such pressure to bear upon his father, in relation to the dispositions of his last will, it is valid if he was of sound and disposing mind and memory."

The verdict was for the defendant.

The plaintiffs took out a writ of error, and assigned for error the rulings as to the offers of evidence, the answers to the points, and the portions of the charge included in brackets.

*J. McD. Sharpe* (with whom were *Stambaugh & Gehr, Kennedy & Stewart* and *F. M. Kimmell*), for plaintiffs in error.— Excluding the evidence offered would leave the proof of capacity to the subscribing witnesses, which might do great mischief: Har-

[Thompson v. Kyner.]

rison v. Rowan, 3 W. C. C. R. 581; 1 Redfield on Wills 525. After insanity is established, the burden is on the party alleging a lucid interval when the will was executed: 1 Redfield on Wills 112; Harden v. Hays, 9 Barr 152; Landis v. Landis, 1 Grant 248. The expression of opinion on the testimony was too strong: Hamet v. Dundas, 4 Barr 181; Nieman v. Ward, 1 W. & S. 68; Parker v. Donaldson, 6 Id. 132; Kiester v. Miller, 1 Casey 481; Ralston v. Groff, 5 P. F. Smith 278; Bogle v. Kreitzer, 10 Wright 466; Cadbury v. Nolen, 5 Barr 320; Keeler v. Vantuyle, 6 Id. 250; Trovillo v. Tilford, 6 Watts 468; Strohl v. Levan, 3 Wright 177; Graff v. Pittsb. & Steub. Railroad, 7 Casey 489; Ditmars v. Commonwealth, 11 Wright 335; Lane v. Commonwealth, 9 P. F. Smith 371. As to the instructions on the subject of testamentary capacity, Stevenson v. Stevenson, 9 Casey 469; Leech v. Leech, 9 Harris 69; McMasters v. Blair, 5 Casey 303; Daniel v. Daniel, 3 Wright 191; McTaggart v. Thompson, 2 Harris 149; Winchester's Case, 6 Reports 23; Dornick v. Reichenback, 10 S. & R. 91. As to the answer to the defendants' 10th point, 1 Redfield on Wills 128; Coleman v. Robertson, 17 Alabama 84. As to the instruction in regard to Mr. Ross's attestation, Barker v. McFerran, 2 Casey 211; Lossee v. Lossee, 2 Hill 609; Fox v. Evans, 3 Yeates 506; McElwee v. Sutton, 2 Bailey 128.

*G. W. Brewer* (with whom were *J. R. Orr* and *J. Cessna*), for defendants in error.—The test is the competency of the testator at the execution of the will: 1 Redfield on Wills 38, 39; Stevens v. Vancleve, 4 W. C. C. R. 262; Harden v. Hays, 9 Barr 163; Grabill v. Barr, 5 Id. 443; Stevenson v. Stevenson, 9 Casey 472. There was no evidence of undue influence, and that question should have been withdrawn from the jury: Daniel v. Daniel, 3 Wright 191; Eckert v. Flowry, 7 Id. 52. The whole charge is to be taken together; the court may express an opinion on the facts: Porter v. Seiler, 11 Harris 428; Ditmars v. Commonwealth, 11 Wright 337; Watts v. Cummins, 9 P. F. Smith 88; Manhattan Ins. Co. v. Webster, Id. 231. As to the comparative capacity for a contract and a will, 1 Redfield 123, 124. The attestation of witnesses is strong evidence of capacity: Werstler v. Custer, 10 Wright 503.

The opinion of the court was delivered, July 7th 1870, by

THOMPSON, C. J.—Testamentary capacity is always presumed to exist until the contrary is established. An abnormal condition of mind is never presumed when a testator makes his will, unless a previous aberration be shown, of such a nature as may admit of a presumption of recurring unsoundness at any time: 4 Wash. C. C. Rep. 262; 8 Shepley 461; 5 Johns. 144; 1 Pet. C. C.

[Thompson *v.* Kyner.]

Rep. 166. It is true, the witnesses to a will when produced for probate, are asked whether they regarded the testator of sound and disposing mind and memory, but this is form merely, for in case of death, absence or incapacity of the witnesses to testify, proof of their handwriting satisfies the requirement of proof of execution.

What constitutes the want of a sound disposing mind and memory is incapable of a definition suited to all cases. Every case is, to a great extent, to be tested by its own facts, circumstances and surroundings. We can do but little more than generalize in regard to the subject.

As the will before us is contested on the grounds of want of capacity in the testator to make a will, and also undue influence in executing it, if he had capacity, we may as well here refer to some authorities on these points, which show the opinions of courts and writers in similar cases, and which are regarded as tests in such cases since their announcement.

On the subject of testamentary capacity, Redfield on Wills (p. 124), says: "the result of the best considered cases upon the subject, seems to put the question of understanding requisite to the valid execution of a will upon the basis of knowing and comprehending the transaction; or in popular phrase, that the testator should, at the time of executing the will, know and understand what he is about." "Old age, failure of memory, or habitual drunkenness, will not (*per se*) constitute incapacity to execute a will:" 1 Green Ch. Rep. 11; 5 Johns. C. 158; and in 2 Green 581, it is said, "the power of making a valid will is not impaired by the approach of old age." In Converse *v.* Converse, 21 Vt. 168, it is held, that "if the testator was at the time capable of understanding the nature of the business and the elements of the will, that is, the nature and extent of his property, and the persons to whom he meant to convey it, and the mode of distribution, it is sufficient." This is our rule as stated in McMasters *v.* Blair, 5 Casey 298: "To understand in detail," say this court, "all that he is about, is quite sufficient." In Daniel *v.* Daniel, 3 Wright 191, the substance of this rule is stated in the court below, but more definitely expressed by this court. "A sound and disposing mind and memory," say the court, "is one in which the testator is shown to have had at the making and executing his will, a full and intelligent consciousness of the nature and effect of the act he is engaged in; a knowledge of the property he possessed; an understanding of the disposition he wished to make of it by the will, and of the persons and objects he desired to participate in his bounty. It is not necessary he should collect all these in one review. If he understands in detail all he is about, and chooses with understanding and reason between one disposition and another, it is sufficient." This is but an expression of what

[Thompson v. Kyner.]

was said in Storms v. Vanclive, 4 W. C. C. Rep., *supra*, where the court, in regard to the testamentary capacity in that case, puts to the jury the inquiry : "To sum up the whole in the short, simple and intelligible form, was his mind and memory sufficiently sound to enable him to know and to understand the business in which he was engaged at the time he executed his will ?"

These citations, to which many more might be added, contain in a generalized form a rational rule on this subject, which is entirely capable of application by a court and jury. It is not meant in any of them that the mind may not be weakened by old age, or sickness, or other causes. That may be the case and no alienation or abnormal condition exist. Weakness alone will not invalidate a will, if mind and memory exist sufficient to understand the subject in hand, and to direct intelligently the dispositions desired to be made of property. The test of all this is to be of the time when the will is made, including some latitude of proof before the execution, and immediately, as contradistinguished from remotely, after it.

The most usual attack on the will of an aged testator, and it is made here, is undue influence, which is, of course, a concession of capacity, although weak. In a recent case, this court has given its view of what constitutes the requisites to overturn a will on this ground, and I will content myself with referring to it alone. In Eckert v. Flowry, 7 Wright 46, Strong, J., in speaking on the subject, said : "It (undue influence) may be either through threats or fraud; but however exercised, it must, in order to avoid a will, destroy the free agency of the testator at the *time when* the instrument is made." In the language of Woodward, J., in McMahon v. Ryan, 8 Harris 329, "it must be a present constraint, operating on the mind of the testator in the very act of making the testament." The learned judge, proceeding to the facts of the case, said, "unless, therefore, there was some evidence tending legitimately to prove that some fraud had been practised upon the testatrix at that time (the 21st of June, the date of the will,) or that some misrepresentation had *then been made*, or that some physical or moral coercion had been employed, such as to destroy her free agency, the court erred in submitting to the jury the question, whether undue influence had been exerted." * * "Neither moral nor physical constraint is to be inferred from mental weakness alone. That undue influence which suffices to destroy an alleged will, is distinct from weakness, and has no necessary connection with it." All this is fully supported by the best authorities, and is to be regarded as a true exposition of what it treats.

As to the assignments of error, then :—1st. The first is upon an exception taken to the exclusion of a portion of the offer contained in the first bill of exceptions. That portion referred to alleged declarations of the defendant, without limitation as to

[Thompson *v.* Kyner.]

time, place or the circumstances of making them. The court rejected all but such as related to the sanity or mental capacity of the testator at or before the time when the alleged will was made, or within a short period thereafter. This was right on every principle; such declarations are of slight weight, at all events; not sufficient to impeach a will on the ground, either of want of capacity, or of undue influence; or materially to aid in it. They must be shown to have been made when the subject of them is a transaction of a present or recent nature, showing that the mind of the declarant is actually in contemplation of what it has been referring to. The testimony offered referred to alleged settlements and transactions about the testator's farm, or the rents, issues and profits thereof, and conversations of the parties relative thereto subsequent to the year 1855, the year in which the will was made, and the admissions and declarations of the defendant in regard to his sanity and mental capacity. This much of the offer was objected to and the objection sustained, excepting so far as it related to a time prior to the execution of the will, or to the time of its execution, or within a short period thereafter. This was a just and proper discrimination. The mental capacity of the testator was to be judged of by its condition at the time he performed the testamentary act. "Nothing else in the case," said Woodward, J., in Stevenson *v.* Stevenson, 9 Casey 472, "was worthy the consideration of the jury." The offer, however, was unlimited both as to the time before and the time after the execution of the will. It would have been error to have admitted the offer as proposed, either for the purpose of impeaching capacity, or showing undue influence. Both grounds upon which this will was attempted to be assailed required the testimony to refer to the time of its execution. If the evidence tended to support either, some latitude in regard to the condition indicated by the proof might be properly allowed as corroborative of that condition. But the offer in this case showed neither incapacity nor undue influence at the time. It was not at all inconsistent with testamentary capacity or entire independence. The preponderance of testimony in the case was, that the testator went alone to his lawyer and got him to draw his will. He did not go there under compulsion, or instruction from anybody as to how his will was to be drawn, or who were to be the recipients of his bounty; at least there is no testimony to this effect. The theory of the plaintiff's case rests on a presumption from a presumption, which is not allowable, namely, that the testator, being an old man, must be presumed to have been weak, and therefore it is to be presumed, that the defendant, who was taking charge of his farm, and was an active-minded man, coerced his will. Weakness alone proves neither want of capacity nor undue influence. Hundreds of cases show that mere weakness does not incapacitate the making of a

[Thompson *v.* Kyner.]

will, and it must not be implied from such a circumstance alone that a devisee has been guilty of a wrong and fraud in procuring a devise of property which it might be supposed he would not have been likely to have obtained, except by coercion of his will. Such a thing would be a fraud, not only upon the testator, but upon his heirs, equally entitled to his beneficence as was the intermeddling procurer of the devise to himself, and it is not to be presumed, but is to be established by competent and clear evidence. The argument of the able and industrious counsel for the plaintiff in error on this point, I think was hardly ingenuous in one particular. It assumed as proved, the pre-existence of some sort of *dementia* on the part of the testator prior to making his will, and that the proposed testimony, including the defendant's declarations, went to disprove a lucid interval when the will was made. There was no evidence whatever of previous *dementia*, and consequently no place for any such argument. It would be a most extreme use of the admissibility of inference from facts, to allow it to be inferred that because an old man, worn out by time and toil, yields up to the management of a son, that which he can no longer from physical inability manage himself, that this prudent and wise result is to be ascribed to insanity or dementia. There were no other grounds than these, that I can see, for inferring lunacy; and the necessity of proving a lucid interval was not therefore in the case.

But it is further argued, that the testimony offered would have shown that the state and condition of the testator's mind was unsound from weakness and decaying intellect after the making of his will, and therefore no presumption was to be made in its favor by subsequent acquiescence in it. I admit that proof to rebut a material presumption may be given. This has often been decided, and as in other matters of proof, the order in which it may be given is subject to the choice of the party offering it, and to the discretion of the court as to the time of receiving it. But the presumption to be rebutted must always exist or arise out of some state of facts in the case. For instance, in order to give room for such a presumption as acquiescence by the testator in a will once made would afford, it should appear that there was something tending to show undue influence. That not being in the case the presumption was of no consequence or importance, and the offer to rebut it was foreign to the question raised. What is here said is applicable to the second bill of exceptions also. This offer was to show the testator's condition of mind until his death. That he was weak and imbecile. It was overruled on objection by defendant, and the court charged the jury in answer to his 15th point, that inasmuch as he had objected to the testimony showing his condition offered by the plaintiffs, he should not have the benefit of the presumption of continued acquiescence,

[Thompson *v.* Kyner.]

unless he affirmatively proved his continued competency, when the other side might rebut. The defendant did not accede to this, and the case stood alone on the proof of his capacity, and the proof on the subject of undue influence at the time of making the will. The plaintiffs were, therefore, not injured in the rejection of testimony to rebut a presumption which was not allowed to be insisted on. For all these reasons, the assignments of error based on the bills of exceptions to the rejection of testimony are unsustained.

It is not possible, with a due regard to other duties pressing upon us, to answer in detail, the positions taken by the learned counsel for the plaintiff in error. I shall notice them cursorily only.

The strong expression of opinion of the learned judge complained of, after recapitulating the testimony in support of the testamentary capacity of the testator, is the subject of exception. It was but an opinion, it did not bind the jury, for all the facts referred to were submitted to the jury for their consideration, to form their own judgment of, in the general charge. The expressions of opinion are very short of the cases cited to prove it error; such as Cadbury *v.* Nolen, 5 Barr 320; Keeler *v.* Vantuyle, 6 Barr 250; Stohl *v.* Levan, 3 Wright 177. I hold the opinions expressed are justified on the principle suggested in Graff *v.* The Pittsburg and Steubenville Railroad Company, 7 Casey 489. A court could hardly have permitted a verdict to have stood against the preponderating evidence in the case, over what, by all the rules suggested, was proper testimony in the case of a will attacked for want of testamentary capacity. Almost none of it applied to the time of making a will. But aside from this the court only expressed its opinion, and did not in any way bind the jury to follow it. There was no error in this.

Another complaint is, that the learned judge said, that it needed much less capacity to make a valid will, "than is sufficient, in most cases, to transact ordinary business;" certainly, than was required to make a simple will like the one in hand, "where the testator gives his wife what the law gives her, $400 to each of his children excepting one, and to him the remainder." This point was at best an abstraction in its bearing on the case, but in general it was entirely true. There was no error, therefore, in this.

As to the point in the argument taking exception to what the learned judge said in relation to the testimony, detailing what Mr. Ross, deceased, who drew the will, said on the evening of the day he drew it, little need be said. I must say, however, that I am not disposed to concede the propriety of the admission of what the deceased subscribing witness said on the occasion. It was admitted, and the plaintiffs have nothing to complain of on that score. I do not think the court would have been justified at all in charging the jury that the evidence of what he said, "was of grave import-

[Thompson v. Kyner.]

ance in estimating the actual fitness of Mr. Kyner to *then* dispose of his estate." Ross represented him according to the testimony as "excited and confused" at the time. He did not say he was imbecile, or any way incompetent to make a valid testament. He was "excited and confused." How long this continued, whether it was momentary or continuing, or whether it amounted to inability to declare intelligently his wishes, is not intimated—is left in the dark and entirely to conjecture. It did not, in our opinion, in the least impeach the testimony which the suggestion of the witnesses imported, namely, the presence of testamentary capacity. Nor did the superadded declaration, that he would hold the will in his own hands, add any weight to the declaration. A great many wills might be set aside if such remarks of a deceased subscribing witness, not amounting even to an intimation of a belief of incapacity, were allowed to outweigh the effect of attestation by the witness. We have examined the elaborate arguments presented to convince us of error in the court on the trial below, and the answer to it, and considered all the testimony, and we see nothing in any of the complaints made, that causes a doubt of the accuracy of the court.

The judgment below is therefore affirmed.