# Eddey's Appeal.

1. Where the testimony, taken under a petition to the Orphans' Court for an issue devisavit vel non, is such that the court in the exercise of a sound discretion ought not to sustain the verdict of a jury against the validity of the will based upon such testimony, the court should refuse to direct an issue.

2. Where the overwhelming weight of the testimony as to facts shows testamentary capacity on the part of a testator, the testimony of disappointed or insufficiently informed witnesses to the effect that *in their opinion* the testator did not have testamentary capacity, has but little value in determining the question whether an issue devisavit vel non shall or shall not be granted.

3. The testimony in this case held to be wholly insufficient to warrant the granting of an issue.

[Eddey's Appeal.]

March 31st, 1885. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT and CLARK, JJ. GREEN, J. absent.

APPEAL from the Orphans' Court of *Philadelphia county:* Of July Term 1884, No. 150.

This was an appeal by Clara E. Eddey and Frank L. Eddey from a decree of said court, refusing their petition, sur appeal from the Register of Wills, for an issue to determine the validity of the will and codicil of Joshua P. B. Eddey deceased.

On October 2d, 1882, soon after the death of Joshua P. B. Eddey, the Register of Wills admitted to probate, against the objections of the above named Clara E. and Frank L. Eddey, the following will and codicil, executed by the decedent:—

I, Joshua P. B. Eddey, of the City of Philadelphia, minister of the Gospel, being of sound mind, memory and understanding, do make and publish this my last will and testament, hereby revoking and making void all other wills by me at any time heretofore made:—

I direct all of my just debts to be paid, and a suitable monument to be erected over my grave by my executors.

*Item*—I give and devise unto my niece, Sarah, daughter of Josiah Eddey, the southermost one of my two houses and lot thereunto belonging, situate in Tombs Row, on the Perry Road in South Camden, State of New Jersey, and to her heirs and assigns forever.

*Item*—I give and devise unto Isaiah C. Wears my two houses and lots thereto belonging, situate on Apple Street, in the City of Philadelphia, and to his heirs and assigns. And I forgive him all judgment claims and debts he may owe me at the time of my death and my executors are not to take any account of or collect any part thereof.

*Item*—I give and devise unto the society called "The United Brothers and Sisters of the Reverend Joshua P. B. Eddey," of the City of Philadelphia, my house and lot thereunto belonging, situate on Lombard Street, No. 531, in the City of Philadelphia, for a hall, and to their successors and assigns forever.

All the rest, residue and remainder of my estate, real, personal and mixed, whatsoever, and wheresoever, of which I shall die seised and possessed, or to which I shall be entitled at my decease, I direct my executors hereinafter named or the survivor of them to sell and convert into money as soon as may conveniently be done after my decease, and for that purpose I do hereby authorize and empower them or the survivor of them to sell and dispose of all the residue of my real estate either at public or private sale or sales, and for such price or prices and upon such terms and conditions as to them or the

survivor of them shall seem best, and to grant and convey the same by proper conveyances and assurances in law, to the purchaser or purchasers thereof, his, her or their heirs and assigns; free from all liability of the said purchaser or purchasers for or on account of the application of the purchase money: and to do all things necessary or proper for the sale and disposal of my said real and personal estate as fully and absolutely, and with the same force and effect as I myself could do if living:

And when the whole of my said residuary estate shall be converted into money as aforesaid, then I give and bequeath unto my sister Rebecca Bradfield the sum of five hundred dollars.

*Item*—I give and bequeath unto my grand-nephew Joshua P. B. Eddey, son of my niece Elizabeth, daughter of my sister Annie Bruce, the sum of four hundred dollars, and to each of the other children of my said niece Elizabeth the sum of two hundred dollars.

*Item*—I give and bequeath unto each of the children of my nephew Samuel Bruce, son of my sister Annie Bruce, the sum of two hundred dollars.

*Item*—I give and bequeath unto each of the children of Isaiah C. Wears, the sum of three hundred dollars.

*Item*—I give and bequeath unto the "Pennsylvania Company for Insurance on Lives and Granting Annuities" the sum of three thousand dollars in trust, to invest the same and collect and pay over the net income and interest thereof unto my granddaughter Sarah E. Lewis, daughter of Sarah Tingle, deceased, for and during the term of her natural life, and upon her death, then to pay the principal unto her son, Jacob Lewis, his heirs and assigns.

*Item*—I give and bequeath unto the "Pennsylvania Company for Insurance on Lives and Granting Annuities" the sum of one thousand dollars in trust, to invest, and collect and pay over the net income and interest thereof unto my grandson, Frank Eddey, son of Richard Eddey, deceased, for the term of his natural life, and upon his death then to pay the principal to such child or children of the said Frank Eddey as may then be living, and the issue of such as may then be deceased (such issue of any deceased child or children to take only the share his, her or their parent would be entitled to if living)—share and share alike—but in case the said Frank Eddey should happen to die without leaving him surviving any child or children, or the issue of any deceased child or children, then in trust to pay the said principal to the society called "The United Brothers and Sisters of the Reverend Joshua P. B. Eddey," their successors or assigns.

[Eddey's Appeal.]

*Item*—I give and bequeath unto Isaiah C. Wears, the sum of one hundred dollars, in trust, to pay the same over unto Clara E. Eddey, daughter of my son Joshua P. B. Eddey, Jr., in ten annual payments of ten dollars each, without interest; and if she should happen to die before all of the payments are made, then to pay the remainder unto " The United Brothers and Sisters of the Reverend Joshua P. B. Eddey," their successors or assigns.

I nominate and appoint Isaiah C. Wears and John A. Burton, executors of this my will, and I direct and give them, or the survivor of them, full power to settle all claims or debts either in favor or against my estate in any manner they or the survivor of them may think best. And they are not to be held responsible or answerable for any error of judgment or involuntary loss, nor be accountable for any more money than they shall actually receive, and they shall reimburse themselves all charges, costs and expenses in the administration of my estate, and they shall receive for their services five per cent. of the gross or total valuation of my estate, real as well as personal, and as much more in addition thereto as the Orphans' Court may deem a reasonable compensation.

In witness whereof, I, Joshua P. B. Eddey, the testator, have to this my will set my hand and seal, this tenth day of February, A. D. one thousand eight hundred and seventy-nine (1879).

Signed, sealed, published and declared by the above-named Joshua P. B. Eddey, as and for his last will and testament, in presence of us who have hereunto subscribed our names, at his request, as witnesses thereto, in the presence of the said testator and of each other.

    W. E. LITTLETON, 514 Walnut Street.

    ARTHUR M. BURTON, 504 Walnut Street, Philadelphia.

JOSHUA P. B. EDDEY.
[SEAL.]

## CODICIL.

I, Joshua P. B. Eddey, the within-named testator, do hereby make and publish this codicil to be added to my last will and testament, bearing date the tenth day of February, A. D., 1879, in manner following, to wit:

All the rest and residue of my estate of every kind, I give

and bequeath unto Josiah Eddey, my only brother, and Isaiah C. Wears, my cousin, share and share alike, and I hereby ratify and confirm my said last will and testament, in all other respects.

In witness whereof, I have hereunto set my hand and seal, this twenty-second day of November, A. D. one thousand eight hundred and eighty-one (1881).

Signed, sealed, published and declared by the said Joshua P. B. Eddey as and for a codicil to his last will and testament in the presence of us, who in his presence and the presence of each other, have, at his request, subscribed our names as witnesses thereto.

> JOSHUA P. B. EDDEY.

    THEODORE GOULD.
    JOSEPH S. THOMPSON.

The petition of Clara E. and Frank L. Eddey to the Orphans' Court set forth that the petitioners are grandchildren and heirs-at-law of the decedent; that at the time the alleged will and codicil purport to have been executed the decedent was of unsound mind; that the said alleged will and codicil were procured by the undue influence, fraud and duress of the parties named therein as legatees and executors. The petition, as amended, requested the court to certify to the court of Common Pleas for trial the following issues of fact; viz:

Whether at the time of the making of the alleged will, dated the tenth day of February, A. D., 1879, the said Joshua P. B. Eddey was of sound, disposing mind, memory and understanding.

Whether the said alleged will was produced by undue influence, fraud, imposition or duress.

Whether at the time of the making of the alleged codicil, dated the twenty-second day of November, A. D., 1881, the said Joshua P. B. Eddey was of sound, disposing mind, memory and understanding.

Whether the said alleged codicil was produced by undue influence, fraud, imposition or duress.

Each of the proponents filed a separate answer denying the facts set forth in the petition, upon which issue was joined by the filing of replications.

The testimony, taken before an examiner, showed that the decedent, a colored man, died September 25th, 1882, at the

age of 85 years. He was born in slavery in Virginia or Maryland, in 1797, but was freed while still an infant. He afterwards removed to Pennsylvania, and since 1835 lived in Philadelphia. Though without education he could read, write and could keep some accounts. In various business he accumulated a large estate, amounting in value, at the time of his death to over $100,000. Late in life became a preacher in the Colored Methodist Church.

Testimony on the part of the contestants was to the effect that about forty years prior to his death he underwent an entire change of mind, manners and habits; from being a frank, genial man, he became despondent and lived the life of a hermit and miser, secluding himself in two rooms in a little frame shanty, where for thirty years he lived by himself amid dirt and vermin, doing his own house work, and hoarding and hiding his wealth in holes about the place. It was alleged that this change was caused, primarily, by suddenly discovering his wife in the act of adultery with his own brother, Josiah Eddey (one of the residuary legatees under the codicil) for which cause he obtained a divorce. Numerous witnesses testified that they did not believe he possessed testamentary capacity at the date of the will and codicil; some said he had told them that he had suffered two strokes of apoplexy or paralysis; he walked with a cane; was forgetful, would think he had given workmen lumber and hardware to repair his houses, when he had not; "the old man's mind was so feeble that he didn't know what he was saying half the time;" would fail to recognize persons whom he had known well. His next door neighbor who had known him twenty-nine years testified: "The latter part of his life he was weak, absent-minded and forgetful; he told me he was not capable of performing the duties he formerly did; he would bring letters in; notes to read for him; bring the same notes two or three times; this would occur two or three times a week; told me of the trouble with his wife, bragged of being the first colored man to gain a divorce in the courts of Pennsylvania; in the latter part of his life he would frequently give me too much change; complain in not being able to transact his business; complain of feeling unwell, about his mind not being in the same condition, not able to get round as he had some years before; during latter years of his life I drew many notes for him, furnished the paper, etc., as paper he had was not in condition to write on; conversed with him upon subject of his will up to the last time I saw him; about three months before his death said he had made no will; that Burton and he were going over it at the present time; I spoke of it on several occasions before that; each occasion said it was not completed; this he told me fre-

[Eddey's Appeal.]

quently, from the summer of '78 to within three months of his death; said the Lord had not helped him out in the way of disposing his property; he was convicted of forging a name to a judgment note for the purpose of collecting money; don't think he was capable of making a will in February, '79, or November '81; while talking business to him, often go off into a sleep, and want to know what we were talking about."

John D. Lewis (colored) a member of the Philadelphia bar, and of counsel for the contestants, testified: "Knew Eddey; acted as his counsel in several cases; his principal time occupied in litigation; regarded him as a crank; told me he was a minister of the gospel; lived in couple of rooms on South street, excluded from his family or relatives. He said he did all his house-work and preferred to live alone. I applied to Orphans' Court for his discharge as administrator to his son's estate, in behalf of his grandchild, Clara Eddey, for the reason of old age and incompetency; the case of slander, Lewis *v.* Eddey, was never pressed by me, though it remained on the list up to Mr. Eddey's death, five years, for the reason I did not consider Mr. Eddey responsible for the language and injury, because of his old age, eccentricities and mental condition; case was never tried. . . . . . . Said the charge of forgery was owing to his domestic trouble; at times he scarcely knew what he was doing. He told me he had been paralyzed on two or more occasions. Would speak in highest terms of appreciation of Clara and Frank Eddey as his grandchildren; other times he would say he did not own them as his grandchildren. In my opinion he did not possess sufficient mind or memory to dispose of his estate by will."

There was little or no testimony in support of the allegation of undue influence.

The foregoing and much similar testimony as to want of testamentary capacity was contradicted by many witnesses called by the proponents, who testified that during the later years of his life, as well as previously, he was a man of firm character, strong will, and of marked ability in business matters. George Tucker Bispham, Esq., remarked of him: "He was a firm man. A man who could not be easily influenced. He was a person of very decided and positive mental traits. He was a positive man in every way. I considered him of shrewd mind, and of very good business capacity. He had a good memory; he was intelligent, and he always understood what he was about. He was very careful of his own interests. He was, I considered, a sharp man of business." Mr. John A. Burton said of him, "he was of a strong personality, self-contained, and altogether more than an ordinary man both in physical and mental respects." Hon. Benjamin Harris Brews-

ter said: "I thought him one of the remarkable characters I had known in my life. I thought he was an uncommonly firm man; of great resolution and will. He frequently consulted me about business matters, was always clear-headed, and always competent to determine matters, and understood what was explained to him. He would not do anything unless he did understand it too. I had to be very careful in explaining everything; he never took anything for granted." Some time after the date of his will, he took it (from a safe deposit company where he had kept it) to Mr. Brewster, to consult him about making a codicil, as to which Mr. Brewster further testified:

"I urged that whatever he was going to do with the codicil he ought to do within a reasonable time, because he was getting old: I said, there will be a scramble over your estate, there will be a fight about it if you don't suit some of your people, they will make a complaint, and you had better do it soon. I did not wish to prepare it, I told Mr. Eddey so. He wanted Mr. Wears to consult with me about it; Mr. Eddey himself spoke of it in the presence of Mr. Wears, and in his absence, but Mr. Wears was reluctant to interfere with it. When I spoke to him he said he would rather the old gentleman would attend to it himself, he did not want to be accused of making a will for himself, he did not want to have anything to do with it, he wanted it to be his free act. I said I would rather not make the will. Mr. Burton prepared this former will, he has been your counsel for so many years. As Mr. Burton has prepared the will, you ought to get him to prepare any codicil."

Mr. John A. Burton testified in substance, in reference to the drawing of the will, that early in 1879, in pursuance of Eddey's instructions, he prepared a draft of the will, that while consulting with Eddey in reference to such draft, he (Burton) remarked, that the legacies left to his grandchildren were very small in comparison to the value of his estate, and Eddey said he knew that to be so; but his reasons for Sarah Lewis, his granddaughter, were that her character and vices were of such a character that to leave her anything that she could get herself, but a mere pittance, would be worse than throwing his money away; that she was addicted to drunkenness, and that anything more than a mere amount sufficient to feed and clothe her would be worse than useless. As to Frank Eddey, he said: That his associates and mode of life, and what he had done so far as he had lived, was conclusive to his mind that any amount of money given to him would be of no benefit to him. When he came to the grandchild Clara Eddey, I knew something of Mr. Eddey's mind in respect to her. He

had expressed himself that when her father died she was very decent, and that he had felt extremely kindly towards her, but she had pursued a course, and she had taken advice which it seemed to him on every hand she had lost all filial affection and all respect; and I suggested to him that those things had probably been the result of bad advice or-improper advice or over-zealous friends, and that she was young, and that he ought to overlook some of them and leave her something considerable; and he did put in the first draft of the will $500. But he said that she was old enough to have a mind of her own on the subject, and that it appeared to him that her course had been wilful ingratitude, and he declined, and directed me to put in the first draft the sum of $500. When that draft was prepared and ready for him and read to him, he peremptorily ordered or directed me to take that out, and leave the $100 as appears in the will that was probated.

Mr. Eddey then directed Mr. Burton to insert the name of Mr. Wears as executor. Burton objected to serve himself, but finally on Eddey's insisting agreed to serve.

Subsequently, in 1881, Eddey directed Burton to draw two codicils, one disposing of the whole residuary estate with a blank for a name, and another with several blanks abrogating so much of the first codicil as might be filled in the second. Subsequently Eddey called at Burton's office, and the drafts were read to him, and Eddey told Burton to put the drafts in his drawer till he should want them. They remained there some time, and Eddey called again and stated he would come up in a day or two to execute one of them.

Isaiah C. Wears, one of the executors, testified, in substance, that Eddey told him he had ordered Burton to prepare a paper providing for the residue of his estate; and a few months afterwards directed him to go and get the paper, which Wears did, stating his instructions to Mr. Burton. Burton handed Wears the two papers, stating that Mr. Eddey, before he should execute a codicil, had better have that codicil rewritten. . . . . . Wears took the papers to Eddey, stating what Burton had told him, when Eddey read them over, put them away, and nothing more was said about the matter. Some three weeks afterwards, Wears being at Eddey's house, Eddey brought out these papers and said: "Take them up and get Jerry to copy them." Jeremiah Calloway, a son-in-law of mine, and a very nice penman, and he (Eddey) knew it. He had prepared papers for him before, engrossed a deed for him, &c. Wears did as directed. Mr. Calloway copied them just as they came from the hands of Mr. Burton, without putting any date to them. They were returned. I (Wears) took them back to Mr. Eddey myself. . . . . . He looked over

them again, and just as he had acted before, he put them away again. An interval of a week or ten days, probably two weeks, occurred without anything further being said. Mr. Eddey after that time spoke again about making his will. He always called it making his will. He went then and got the papers, brought them down and looked over them again, then he said to me, you must fill up these blanks. I told Mr. Eddey that that ought to be done in the same hand. He told me to take the codicil up—I don't know that he used the term 'codicil'—and he said, 'tell Jerry to put Jo's name in (his brother) and yours,' and he added this remark, 'I want to close the door.' My understanding of that remark was, he had another paper before him which was to give him the privilege and opportunity of taking from that codicil for any other case where he might choose to give or to bequeath, or any case where he might choose to bequeath any of his estate. This other paper had also been copied by Mr. Calloway from Mr. Burton's draft, and was in his possession. This paper—first paper—was taken by me back to Mr. Calloway, and he inserted these names, the names of Josiah Eddey, his brother, and of myself, I. C. Wears. The paper was then brought back to Mr. Eddey, taken back by me to Mr. Eddey. He looked over it again as he had previously done, and put it away in a box up on the shelf, in the little store that he had, in a box, a paper box. Some time after that, I can't tell how long, all of a week or so, more perhaps, he said that he would like to have the Rev. Mr. Gould, Theodore Gould, and Mr. Thompson, Reverend Thompson, to witness his signature to his will, and directed me to so inform them. I didn't see that paper at all until after the death of Mr. Eddey. Messrs. Gould and Thompson came to Eddey's house, and, no one being in the room but Eddey and themselves, witnessed the codicil. They both objected to witnessing it without knowing its contents, but afterwards agreed to do so on Eddey's saying, 'That doesn't matter, all you have to do is to say that is my signature, and that I say or said that is my will.' Wears was not present when the codicil was executed or attested.

The court dismissed the petition for an issue in the following opinion, by ASHMAN, J.:

Cuthbertson's Appeal, 1 Out., 163, laid down a rule of law in the execution of wills, which commends itself to the common understanding no less than to the mind of the profession. Briefly stated, it is that a beneficiary whose legacy is the fruit of his own advice to the testator, backed by the force of a confidential relationship, must show, where that testator is mentally weak, that he fully understood the disposition of his property which is attempted by the will. The testimony now

submitted, which has been examined by us with scrupulous care, fails, we think, to bring this case within the operation of that rule, or at least complies substantially with its requirements.   It was conflicting, in the sense that there were opposing witnesses and irreconcilable statements ; but after eliminating from the mass of irrelevant matter which disfigures the record, the crude opinions, formed upon no perceptible basis of fact, and uttered by persons who could by no courtesy be described as experts, what remains will show that the testator executed the will and codicil with a full and unbiased appreciation of their meaning.   All the circumstances of his history, as they were brought into view by the investigation, disclosed the working of a mind of even phenomenal vigor.   By a shrewdness which owed nothing to education he contrived, out of the scanty opportunities which were possible to a direct descendant of slaves, to get together a considerable fortune.   He was capable of strong resentments, for whose expression his domestic difficulties gave both scope and justification, and his will, if it needs an explanation, is, when read in the light of these facts, perfectly intelligible.   The will and especially the codicil were attacked upon the ground, first, that the testator lacked testamentary capacity when they were executed.   It was alleged that he was suffering at their date from one or more attacks of paralysis, and his own declarations to that effect were testified to by a large number of witnesses.   The only evidences of this disease which they were able to discover for themselves were his failing memory and his use of a cane, infirmities which they were wholly unwilling to ascribe to his age, then verging on eighty-two years.   It was also alleged that he had no knowledge of the value of his property, and that he expected to dispose of it through supernatural agencies. The proof of this was found in his repeated statement that he did not know how many properties he owned, and that the Lord would make his will for him.   These statements, the witnesses admitted, without any consciousness that the admission weakened their force, were made in reply to friendly suggestions that certain charities would be suitable objects for his bounty, and to an equally kind, but perhaps impertinent solicitude to know what he was worth.   The proneness to generalizing was shown by the declaration of one witness that he had always regarded the testator as an imbecile, and of another, that no colored man after he has reached the age of fifty is competent to make a will.   A minister of decedent's faith, who had unsuccessfully interceded on behalf of a charity, expressed the conviction that the testator was a miser, and was therefore, and necessarily, insane.   This is a candid summary of the contestants' case upon the point of mental unsound-

ness; and it must read like a burlesque when contrasted with the testator's character in that respect, as drawn by the proponent's testimony, and by the facts which were incidentally developed on both sides. A physician who had known the testator fourteen years, and who attended him shortly before the codicil was signed as well as in his last illness, declared that he had no symptoms of having suffered at any time from paralysis, and that he was entirely sane; and he was corroborated in every particular by another physician who had been acquainted with the decedent for a longer time, and had prescribed for him between the dates of the will and the codicil. It was shown that, to the last, the testator retained an accurate knowledge of his several properties; that he received their rents, and entertained offers for their sale; that he was present in 1882 at different hearings before a Master; that in that year he presided at a meeting of a beneficial society, and advised its incorporation, and finally, that he attended the class meetings of his church, and so lately as July, 1882, administered the sacraments. The importance of these facts is apparent, when it is remembered that he wrote his will in 1879 and died in September, 1882.

The other ground of attack—that the testator had been unduly influenced by those to whom he left his residuary estate—cast upon the proponents the burden of showing not only that he was left to his own volition, but that he acted intelligently in the final disposal of his property. The latter point needs no further discussion. If he labored under any misconception, it was in the exaggerated estimate which he put upon its value. Respecting the other point, the only circumstance upon which a doubt can be reasonably hung is that he gave one half of the balance of his estate to a relative who, at a remote time, had done him a grievous personal injury. That relative, however, was a brother, and the only one of his blood who, towards the close of decedent's life, appears to have cared for him. Unless we are prepared to believe that neither the lapse of forty years after the occurrence of the wrong, nor the marks of renewed affection on the part of the wrongdoer, could wipe out the hatred which had been engendered, we must explain his generosity in this instance on the same principles by which we account for his parsimony in others. He was estranged, not without cause, from his grandchildren, and in opposition even to the advice of his counsel, he cut down the legacy to one of them from $500 to $100. He was opposed to leaving any benefaction to the charities which had been recommended to him because he had been ill-treated by their officers. On the other hand, his brother had attended him in sickness, and had been entrusted by him with business; and

13 OUTERBRIDGE—27

his co-legatee had been raised as a son by the testator, and had certainly never betrayed his kindness. He was reminded, not by the legatees, but by his counsel, both of whom stand high at this bar, that the bulk of his estate was undisposed of by his will. His reply was, that he had purposely left his will incomplete in order to gain time for deliberation. The manner of execution of the codicil was in keeping with this utterance. He retained the draft, which had been prepared at his request, for at least a week before signing it, and he executed it in presence of witnesses of his own selection, when both of the residuary legatees were absent. During the ten months which followed, and until within a few hours of his death, he performed acts, both public and private, which were utterly incompatible with the theory of testamentary incapacity. We are averse to the taking from a complainant of the opportunity to submit his controversy to a jury; but upon the proofs before us, which, from their volume, we may safely assume to be exhaustive, we are convinced that a verdict for the proponents would be sustained, and we therefore dismiss the petition for an issue.

PENROSE, J., dissents on the authority of Cuthbertson's Appeal, and Wilson *v.* Mitchell, 5 Out., 495.

The contestants thereupon took this appeal, assigning for error the decree refusing to direct an issue on the questions stated in the petition.

*William W. Porter, Ovid F. Johnson, William A. Porter* and *John D. Lewis*, for the appellants.

*Charles F. Corson, Arthur Biddle* and *George W. Biddle*, for the appellees.

Mr. Justice PAXSON delivered the opinion of the court, October 5th, 1885.

This was an appeal from the refusal of the court below to grant an issue to determine the validity of the last will and testament of Joshua P. B. Eddey, deceased.

The questions presented were 1st, whether the testator was of sound mind at the time of the execution of the will; and 2d, whether said will and codicil were procured by undue influence, fraud, imposition or duress.

The latter branch of the inquiry may be dismissed with the remark that we find nothing in the evidence to sustain it. Nor is there anything to bring the case within the ruling of Cuth-

bertson's Appeal, 1 Out., 163, and Wilson v. Mitchell, 5 Id., 495.

Nor are we in any doubt as to the first proposition. We have read the large mass of testimony with care without being convinced that the court below erred in denying the issue. To sustain a verdict against this will would be to do a great wrong. The true rule is that such a case should not go to the jury at all when the court in the exercise of a sound legal discretion would not sustain the verdict : Cauffman v. Long, 1 Norris, 72 ; Wilson v. Mitchell, *supra.*

It would serve no good purpose to discuss the evidence in detail. It would make the opinion of inconvenient and unreasonable length. A few general observations are all that is required.

The testator was altogether a remarkable man. He was born of colored parents in Virginia about 1798. His mothe being a slave he shared her condition of servitude as the law then stood, until his father purchased the freedom of his mother and the children. Joshua, the testator, subsequently removed from Virginia to Columbia, Pennsylvania, and about the year 1835 came to Philadelphia, where he resided until his death in September, 1882. He had little if any education, yet could read and write to some extent, and was able to keep his accounts in a rude way. He appears always to have attended closely to business ; was at one time a barber ; kept an oyster saloon and fruit stand ; later in life engaged in real estate operations and loaning money ; was close if not miserly in his habits, and died leaving an estate in houses and personal property variously estimated at from $100,000 to $150,000. His calling for some time prior to his death was that of a clergyman of the Colored Methodist Church, and he appeared to have enjoyed considerable reputation. It was alleged at one time that he was convicted of forgery, but the record of that case shows the granting of a new trial and no subsequent proceedings. We are bound in the absence of evidence to the contrary to assume that the new trial was granted because of insufficient evidence. It is manifest that he was a man of strong personality, of vigorous mind and will, and not easily turned from his purpose. As was to be expected, an ignorant man of this description, possessed of a large estate, and living alone in two small, illy furnished rooms, was the recipient of a large amount of disinterested advice in regard to the proper disposition of his property by will, in addition to suggestions as to aiding particular charities during his life. He was in the habit of saying that he looked to the Lord for guidance in making his will, which, for a Christian clergyman, was neither heterodox in theology, nor bad in law. That he was shrewd

enough to keep the matter of his will to himself, taking into his confidence only his lawyer who prepared it, and one or two friends, is plain from the testimony; that he purposely misled some of the anxious inquirers is equally clear. A lie is never justifiable for any purpose, yet if there are any circumstances which would give it a color of excuse, it is the case of just such a man as this, pestered with gratuitous advice, and constantly appealed to for money in aid of particular persons or charities. If, as was said by Justice GRIER in Turner *v.* Hand, 3 Wall., Jr., 88, a man be addicted to telling lies about his will, we could not on this account pronounce him unfit to manage his affairs or dispose of his property. Testators sometimes take a peculiar pleasure in misleading anxious relatives, particularly collaterals, in this manner. I remember a case tried before me where a childless old woman, possessed of a considerable estate, seemed to have taken a mischievous delight in deceiving her nieces and nephews. She promised her estate to them all, and deceived them all—but one. It was not considered to affect her testamentary capacity.

There were a number of witnesses who expressed the opinion that the testator was unfit to make a will. The opinion of many of them may be brushed aside as wholly worthless by reason of their lack of knowledge and judgment in such matters. A witness must know what testamentary capacity means before we can attach any weight to his testimony, else no man's will would be safe. Some of the witnesses gave reasons for their opinions which are utterly worthless. As an illustration, Bishop Payne said: "A miser (referring to the testator,) is one who has mistaken gold for God, and property for blessedness. Such a person, in my opinion, is insane, and is therefore incapable of making a judicious will, such as Christians ought to make in view of the teachings of Jesus Christ, especially such as a Christian minister ought to make in view of his responsibility to Christ." This standard is too vague for practical purposes. Another witness thought no colored man is competent to make a will after he is fifty years of age, though a white man may be. Another witness said: "I don't think he was capable of performing the duties of making a will, as he frequently had said that the law had not helped him out in the way he should dispose of his property."

The two subscribing witnesses, Gould and Thompson, appear to have had no doubts as to his testamentary capacity when they signed the will in that capacity, and before they knew its contents. They both swore before the Register that at that time they considered testator to have testamentary capacity. They appear since to have changed their minds.

Gould testified in this proceeding: "From my observation of the decedent and the facts, I must concede that his memory was very poor, and his judgment not what I would think would be sound." Thompson said: "From his condition in 1881, I thought he was not in a condition to make a will, either mentally or physically. From July he did not possess testamentary capacity. Told me several times he did not know what he was worth." Such declarations as the latter are of very little value. A man may say he does not know what he is worth by reason of fluctuating values, or it may be an evasive answer to an impertinent question. In either event it does not even tend to prove want of testamentary capacity

Moreover, a number of contestant's witnesses who thought him incapable of making a will were among those who were disposed to aid him by advice in doing so, and the thought naturally suggests itself that if the will had been in accordance with their wishes it would have materially influenced their views of his testamentary capacity.

Without going into detail the evidence in support of the will is overwhelming. It is in the main given by intelligent witnesses with ample opportunities of information.

We have here the case of an old colored man with sufficient mind and business sagacity to acquire a large fortune, much of it the result of his own labor, frugality and thrift; to take care of it even in old age; during all the time he is charged with being an imbecile he occasionally officiated and preached in his church; he presided at and attended the meetings of various societies; he administered the communion at his church, and solemnized several marriages; attended actively to business, and was shown by witnesses on both sides to have a good knowledge of his property and its value. These are the kind of facts which a court should look at in determining a testator's capacity, and in the face of them the testimony of a crowd of ignorant witnesses, not experts, as to a testator's unsoundness, goes for nothing. To permit a jury under such circumstances to set aside a will in order to give effect to their own notions of what a testator should do with his property under given circumstances, in other words to make a will for him, would be to put many estates in peril, and destroy that assurance which now every man has, that after his death the property for which he has toiled and saved shall go according to the directions of his last will and testament.

Nor is there anything in the disposition of this property which tends to throw a doubt over the case. It is true he cuts off his grandchildren with a small sum, but the reasons therefor appear to have been satisfactory, at least to the testator. He gives the bulk of his estate to his nephew and to his

[Bank *v.* Goodman.]

brother. The former had been brought up by him from a child, and there is little doubt he took commendable pride in his integrity and success. His brother appears to have done the testator a grievous domestic wrong, which at one time troubled and clouded his life. But this was forty years ago, and amicable relations were restored long before his death. If he forgave his brother it was not inconsistent with his religious profession. Aside from all this, a man like this testator, who has amassed a fortune, by a frugality which denies to its possessor even the comforts of life, may be depended upon to leave the hard-earned and harder saved fruits of his toil to some one whom he at least believes will not squander it in idleness and dissipation. This seems to be the key-note to this will.

Upon the whole, we are of opinion that it would be a grievous wrong to allow any jury to set aside this will upon the evidence adduced, and for this reason we sustain the court below in denying the issue prayed for.

> Decree affirmed and the appeal dismissed at the costs of the appellant.