John Kraus, Executor of Mary Kapp, Deceased, *v.* Morris Stein, Appellant.

[Marked to be reported.]

173     221
20 SC   126

*Mortgage—Satisfaction of mortgage—Mental incapacity—Evidence.*

A satisfaction of a mortgage will not be set aside on the ground of the mental incapacity of the mortgagee at the time the satisfaction was executed, where it appears that the mortgagee, a woman seventy-two years of age, in her last illness, and for days before her death, expressed a desire to relieve the mortgagor of the payment of the debt, that she accordingly summoned a justice of the peace and explained her desire to him, and he not being able to act, a second justice of the peace was summoned who prepared the paper according to the mortgagee's instructions, explained it to her and had her sign it with her mark and seal it; that the mortgagor was not present when the paper was executed, and there was no evidence to show that he had anything to do with it, or used any influence to have it signed; that both justices testified that the mortgagee was rational and capable of understanding what she was doing, and the only evidence tending to show mental incapacity was that she suffered much from pain, and was frequently under the influence of morphia, although not to such an extent as to impair her mind.

Argued Nov. 4, 1895.   Appeal, No. 214, Oct. T., 1895, by defendant, from decree of C. P. No. 2, Allegheny Co., July T., 1894, No. 416, on bill in equity.   Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ.   Reversed.

Bill in equity to declare void the satisfaction of a mortgage.

From the record it appeared that the mortgage in question was dated October 21, 1889, and was given by Morris Stein to Mary Kapp.   The satisfaction of the mortgage was dated April 23, 1894.   Mary Kapp died on April 28, 1894, being seventy-two years of age.

Other facts appear by the opinion of the Supreme Court.

The case was heard on bill, answer and proofs by WHITE, J., and a decree was entered declaring the satisfaction of the mortgage null and void, and directing the recorder of deeds to record the decree on the margin of the record of the mortgage.

*Error assigned* was above decree.

*James Fitzsimmons, Joseph Friedman* with him, for appellant. —A will or release signed by a party although in great illness, will not be stricken down in favor of mere volunteers such as the person who is the appellee in this case, without some evidence indicating clearly that this paper was a fraud upon the signer.

*W. J. Barton, Robert Malone* and *Charles F. McKenna,* with him, for appellee, cited, Cook v. Lamotte, 15 Beav. 134 ; Worrall's App., 110 Pa. 349 ; Greenfield's Est., 14 Pa. 489.

OPINION BY MR. JUSTICE GREEN, January 13, 1896 :

This proceeding was a bill in equity filed by the plaintiff as executor, etc., of Mary Kapp deceased against Morris Stein, for the purpose of having set aside a certain sealed instrument acknowledging that the plaintiff's testatrix had received full payment and satisfaction of a mortgage for $2,000 held by her as mortgagee, against the defendant as mortgagor.   The instrument in question was duly signed and sealed by the mortgagee and was also acknowledged before a magistrate and recorded.

The allegations of the bill of the facts upon which the decree to set aside the instrument was asked are four: (1) That the paper was executed without consideration. (2) That it was executed without a full understanding or knowledge on the part of the mortgagee, of the meaning and effect of the instrument. (3) That at the time of the execution of the paper Mary Kapp, the mortgagee, was of unsound mind and mentally incapable of understanding business of any kind, and had been so for some time prior thereto, and (4), that while in a state of incapacity the paper had been procured from the mortgagee by the mortgagor, by the exercise of undue influence.

Two of these allegations may be dismissed at once. It was not pretended that the mortgage. was paid off and that the acknowledgment of satisfaction was made for that reason. It was claimed to be a voluntary gift of the debt by the mortgagee to the mortgagor, and all the evidence in the case was to that effect. As a matter of course it was in the power of the mortgagee to make such a gift, and it therefore did not need any consideration to support it. The allegation of undue influence has not a particle of testimony to sustain it. All the testimony shows that the defendant had nothing whatever to do with the obtaining of the release. Not a witness testifies to a solitary act or declaration of the defendant, even by way of request or solicitation by the defendant, or that he ever exchanged a word with the deceased on the subject. The learned court below found in favor of the plaintiff but not upon any such ground.

The case was heard directly by the court below without the intervention of a master, and the instrument was annulled upon two findings of fact in the following words:

" First. From the evidence in the case I find that the release referred to in the bill and answer was not duly and properly executed, and is invalid for that reason; that it was not read over to Mrs. Kapp or sufficiently explained to her so that she would know what she was doing.

" Second. That at the time that the paper was executed, and extending over a day or two before, and from that time on to her death, she suffered so much from pain, and was so frequently under the influence of morphine that she was not in a condition mentally to clearly understand and comprehend her affairs, or to execute a paper of this kind."

So far as the first of these findings is concerned it can very readily be determined whether it is justified by the testimony or not. There was but one witness who testified to the execution of the instrument and he was the scrivener who prepared it. His name was J. C. Williams, and he was a justice of the peace in the neighborhood. After testifying that he had known Mrs. Kapp since he was a boy and that he was sent for by her, he said that he went to her house on a Saturday morning and was taken to her room and asked her if she knew him: " she said she did ; she told me her business—what she wanted done. Q. State what she told you, just as nearly in her language as you can give it? A. She said that Mr. Houserman the old shoemaker owed her some money on a lot, and that Mr. Stein owed her some money and she wanted to relieve them of any further payment of that money, that she could die happier if that was done before her death. She said that the papers were in a box on the bed—a tin box on the bed against the wall. Q. In her room? A. In her room in the bed she was in, and we would find all the papers in relation to the matter in that box. The lady that was in the room reached over the bed and got the box and brought it to the window."

After testifying farther that they looked in the box for the necessary papers and found some of them, he advised that as to Mr. Houserman, a deed should be executed for the lot on which he owed some of the purchase money, and that Mrs. Kapp and her husband could sign it, and that they agreed to that, and he accordingly prepared such a deed and they executed it; he was asked : " Q. What did she say with respect to Mr. Stein ? A. Well she said her desire was to release Mr. Stein. Q. From what ? A. From the—what he owed her. She spoke of a mortgage and a note. Q. Did she say how much the mortgage was ? A. If I remember rightly, $2,000. Q. Well now what direction did she give you then with respect to that? A. She wanted the same arrangements made with Mr. Stein as with Mr. Houserman?" He then explained why he did not go back on Saturday, because the doctor said she was worse in the afternoons than in the mornings, and that he went back on Monday. He saw her then and said, " I asked her if she was in the same mind she was on Saturday and she said yes, that she was, and she told me to sign and that she would make her mark. ·She

raised her knees up in the bed under the covers, and I laid the paper down lightly, and she caught hold of the pen and made her mark. . . . Q. Did you read it over to her before you took the acknowledgment? A. Yes, sir. Q. And what did she say after that when you read it over to her? A. She said it was just what she wanted to do; if she hadn't of course I wouldn't have insisted on her signing it. Q. You had no interest in it at all? A. No, sir, none at all. . . . Q. Did she say anything at all that indicated she didn't know what she was doing? A. No, sir; she appeared very weak but rational." The witness said further it was between two and three o'clock in the afternoon when he took the acknowledgment, and that he had asked her lawyer to prepare the paper for him, as he did not feel able to prepare it himself, and that it was so prepared. On cross-examination he was asked, " Q. Did you explain to her the meaning of that paper? A. Yes, sir, she told me what she wanted done. Q. Did you explain to her what the meaning of that paper was? A. Yes, sir. Q. What did you say to her? A. I don't remember the exact words; I told her I had come with the paper she had requested me to draw up in regard to the Stein case, and just about that time her daughter-in-law and Mr. Kapp came in; the daughter-in-law came in first and then the old gentleman, and there was quite a confusion there for a little bit. Q. Then what occurred? Did she sign it then? A. Then I asked the daughter-in-law to remain and witness the signature and she refused to do it. She touched the pen and made her mark. . . . Q. When did you read it to her? A. I didn't read it to her; I explained to her that it was the paper that was drawn up to release Mr. Stein as she had requested on Saturday from the mortgage. Q. Didn't you say in answer to Mr. Fitzsimmons that you had read it to her? A. I don't remember, I don't remember the reading of it; I don't think I took the time to read it, I wouldn't be positive. Q. Did you tell her that the paper was to be recorded? A. I don't know that I did; I don't remember. Q. Did you ask her if she acknowledged that to be her act and deed and desired it to be recorded as such? A. I think I did. 'Q. Do you know whether you did or not? A. I wouldn't be positive. I think I did at the time. Q. You think you told her what it was and

she said to you that she would make her mark after it? A. Yes, sir, she did. Q. Did she touch the pen? A. Yes, sir."

There is no other witness who testifies as to what took place at the execution of the paper. The nurse was in just before but went out when Williams came in with the paper. There was some evidence that Kapp the husband was in part of the time but none that he said or did anything. But there was another witness examined who had knowledge of Mrs. Kapp's intention. It was John McNeal, a justice of the peace, for whom she sent before she sent for Williams. He testified that he went into the room "and Mrs. Kapp reached her hand to me and says, 'Its pretty near the end; I am pretty near the end,' and I don't mind what I said but I said, 'I understand you sent for me.' 'Yes, I did,' she says, 'I want to change my will,' and she spoke very well; she says, 'I want to forgive Morris Stein.' Q. Did she point to him? A. She pointed that way with her hand; she says, 'I want to forgive Morris Stein what he owes me,' and I says, 'I came unprepared to write anything of that kind,' and says I, 'Have you the will here I could put it in a codicil,' and she says—I don't recollect whether she says 'I have my will made long ago,' or what, but it wasn't there, and I says here's four or five witnessess, I guess it will do, and I repeated to her, 'All you want to change in that will, you want to forgive Morris Stein what he owes you,' and 'Yes,' she says, and then I went to go out and bid her good-by, and as I went out of the door she held her finger out and says, 'Mind if I should happen to get better he must pay me.' Q. That is all that was said? A. Yes, sir. Q. Did she say what he owed her? A. No, she said, 'All he owes me,' that's the words she said. Q. Did she know you when you went in? A. Oh, yes. She named me; she said she wanted to see me. Q. Did she shake hands with you? A. She shook hands with me and pressed my hand very cordially. Q. How did she appear to be—all right? A. She appeared to be—I might say all right and intelligent, as far as I could judge; I think she was."

The witness explained that he could not write anything at the time for want of writing material, and that he could not go back on Monday as he was serving on the jury in court.

The question arising upon the testimony is, can a finding that the paper executed "was not duly and properly executed

and is invalid for that reason ; that it was not read over to Mrs. Kapp or sufficiently explained to her so that she would know what she was doing," be sustained.   We cannot see how.   The paper was certainly duly and properly executed.   Her name written by the justice was there with her mark properly made. The execution was duly attested.   It was a sealed instrument and no formalities were omitted.   It is impossible to say it was not duly and properly executed.   As to its being read over to her, the witness said at first that he did read it to her but said afterwards that he did not, or that he did not remember that he did, but he adhered to his statement that he did fully explain it to her.   This however is not of so much importance as the paper did contain precisely what she said she wanted to do.   In our judgment it is quite impossible to sustain the first finding of the learned court below.   It must be remembered that the paper was an executed deed and that such papers cannot be set aside for light and trivial causes.   In this case there was not a particle of testimony showing or tending to show the least degree of fraud, mistake, imposition or undue influence, and the paper expressed exactly what the party signing it said she wanted to have done.   There was no confidential relation between the parties, and there is no other circumstance to show that Mrs. Kapp did not understand fully what she was doing.

The second finding does not declare that Mrs. Kapp was of unsound mind when she executed the instrument, and if it did it would be without any testimony to support it.   The fact that she suffered much from pain, and was frequently under the influence of morphia does not in any point of view justify a finding that " she was not in a condition mentally to clearly understand and comprehend her affairs or to execute a paper of this kind."   There was no testimony in the case that there was any excessive use of morphia, or that her mind was impaired by its use.   And there is no standard of incapacity that is not at least mental unsoundness, that will suffice to avoid an executed deed. The physician who attended Mrs. Kapp was examined at much length for the plaintiff, but he gave no testimony either of excessive use of morphia or of mental incapacity from that or any other cause.   He said she was under the influence of an opiate and he did not think she was in a fit condition to transact business at that time, but he admitted on cross-examination that her

disease was not a mental disease but a disease of the liver, and it did not affect her mind except as pain affected it. But his statement was the mere expression of an opinion which was of no consequence against the actual facts attending the execution of the paper. Courts do not permit solemn deeds to be annulled upon any such weak and flimsy testimony as is found in this record. The orphans' courts and this court are in the constant habit of refusing to grant issues upon wills in cases where the testimony is vastly more voluminous and much stronger and more emphatic than any evidence appearing in this record.

Forcible illustrations of this character will be found in the following cases: De Haven's Appeal, 75 Pa. 337 : Cauffman v. Long, 82 Pa. 72 ; Wainwright's Appeal, 89 Pa. 220 ; Wilson v. Mitchell, 101 Pa. 495 ; Combs & Hankinson's Appeal, 105 Pa. 155 ; Eddy's Appeal, 109 Pa. 406 ; Napfle's Est., 134 Pa. 492. We are clearly of opinion that if this case had been tried before a jury and a verdict rendered against the defendant the court below should have set aside the verdict, and failing in that it would have been our duty to reverse the judgment for that reason.

The decree of the court below is reversed and plaintiff's bill is dismissed at the cost of the appellee.