Aggas, Appellant, *v.* Munnell et al.

Argued October 6, 1930. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*W. Walter Braham,* of *Aiken & Braham,* with him *William D. Cobau* and *James Glenn Berry,* for appellant.—The court erred in submitting the question of testamentary capacity to the jury: Lawrence's Est., 286 Pa. 58; Phillips's Est., 299 Pa. 415; Leisey's Est., 280 Pa. 533.

The court erred in charging that a confidential relationship existed as a matter of law and in submitting the question of undue influence to the jury: Vogan v. Jordan, 92 Pa. Superior Ct. 519; Vaughn v. Vaughn, 217 Pa. 496; Lawrence's Est., 286 Pa. 58; Bisbing v. Bank, 93 Pa. 79; Gallagher v. Steam Co., 188 Pa. 95; Renn v. Tallman, 25 Pa. Superior Ct. 503; Wolfe's Est., 284 Pa. 169; Gongaware v. Donehoo, 255 Pa. 502; Phillip's Est., 244 Pa. 35; Caldwell v. Anderson, 104 Pa. 199; Keisler's Est., 213 Pa. 9; Herster v. Herster, 122 Pa. 239.

*John P. Lockhart,* of *Lockhart & Long,* with him *Ralph A. Cooper,* for appellee.—It was the duty of the court, under the facts established by the evidence, to say to the jury that a confidential relationship existed between plaintiff and testator: McCormick v. McCormick, 194 Pa. 107, 122; Robinson v. Robinson, 203 Pa. 400, 416; Caughey v. Bridenbaugh, 208 Pa. 414, 415; Roberts v. Clemens, 202 Pa. 198.

If confidential relationship was established as a matter of fact, then the burden of proof shifts to principal beneficiary to disprove undue influence: Phillips's Est., 244 Pa. 35; Adam's Est., 220 Pa. 531; Miller's Est., 179 Pa. 645; Robinson v. Robinson, 203 Pa. 400.

The evidence of testamentary incapacity was so strong that the trial court, sitting as chancellor, could not permit a verdict sustaining the will to stand: Wilson v. Mitchell, 101 Pa. 495; Snyder's Est., 279 Pa. 63; Lawrence's Est., 286 Pa. 58, 65; Guarantee Trust & Safe Deposit Co. v. Heidenreich, 290 Pa. 249; Draper's Est., 215 Pa. 314; Kane's Est., 206 Pa. 204.

OPINION BY MR. JUSTICE WALLING, November 24, 1930:

William A. Munnell, herein sometimes called the testator, of Volant, Lawrence County, died November 3, 1928, having, on July 21st, of the same year, executed what purported to be his last will. A caveat against its probate having been filed, the matter was certified to the orphans' court and by it to the court of common pleas for jury trial. Testator left an estate of approximately ten thousand dollars and was survived by one son, William B. Munnell and by two daughters, Mrs. Lockhart and Mrs. Aggas, also by four grandchildren, the children of a deceased daughter. In the issue as framed, Mrs. Aggas is the plaintiff and the son and other daughter defendants. The questions of undue influence and testamentary capacity were embraced in the issue. Both questions were submitted to the jury, who found a gen-

eral verdict for the defendants; from judgment entered thereon the plaintiff brought this appeal.

The judgment cannot be sustained. In May, 1927, testator, then eighty-six years of age, whose wife had been dead some eight years, was in need of care; hence, by agreement of his three children, in which he concurred, Mrs. Aggas and her family went to reside with him. Testator was a veteran of the Civil War and was then drawing a pension of seventy-five dollars a month and all agreed that Mrs. Aggas should have free house rent and the pension to use for support of the family. This arrangement was carried out until testator's death. He had suffered a slight cerebral hemorrhage in March, 1926, another in July, 1927, and a third in November, 1927, but none resulted in any paralysis. He had been a man of superior intelligence, had served as school director and for many years as justice of the peace, and was an elder in the church. In addition, for over forty years he had been secretary of a local insurance company, which did an extensive business. The latter position he voluntarily gave up some two or three years before his death. About the same time he handed his securities, amounting to nearly seven thousand dollars, to his son for safe keeping, which was done by concurrence of all the children. Testator had been remarkably vigorous in mind and body until nearly eighty-five years of age and thereafter he declined in both.

Early in July, 1928, Mrs. Aggas, at testator's request, as she testified, called William McElwee, Esq., an attorney at New Castle, to consult with testator with reference to preparing a will. The attorney called on him and discussed the subject in detail. The latter expressed a desire to favor Mrs. Aggas because of her kind care and attention. While testator said he was not prepared to execute a will that day, he at first expressed the wish to give the other children and grandchildren only nominal bequests, and the balance to Mrs. Aggas. She urged that he give the other children substantial legacies. He

finally suggested something like a thousand dollars each for the other two children and one hundred each for the four grandchildren. The attorney suggested that a percentage basis would perhaps better carry out testator's wishes. The attorney testified that at times during this talk testator's mind seemed to falter, and he apparently failed to grasp the percentage idea, and said he desired to think it over. The attorney departed but was called back in a week or ten days and the matter was again discussed. According to the scrivener, testator's mind was clear that day and he said he understood the percentage basis, named his children and grandchildren and gave further directions about the will, but said he was not yet ready to make it and requested the scrivener to come later. This the latter declined to do, but said he would write out the will and mail it to testator so he could execute it or not according to his final conclusion. This was done and later testator had two witnesses called, in whose presence he executed the will. According to the testimony, he soon discovered that the scrivener had made an error in the will which, as written, provided for five grandchildren, when in reality there were but four. This left one per cent of the estate undisposed of. Hence, the will was promptly returned to the scrivener, who redrafted it, giving the one per cent to Mrs. Aggas. As so redrawn, it was returned to the testator, who then had witnesses called and after reading the will asked his daughter for a pen, also the date, which he inserted, signed the will and had it properly witnessed. This was the will in question and, as drawn, gives seventy-six per cent of his net estate to Mrs. Aggas, ten per cent each to the son and other daughter and one per cent to each of his four grandchildren, and bears date of July 21, 1928. No doubt is expressed by the scrivener or either of the witnesses as to Mr. Munnell's testamentary capacity. This is also supported by a number of lay witnesses, probably the most important of whom was William Edenburn, who was and had been

for years a codirector with Mr. Munnell of a cemetery association. The former visited the latter shortly after the execution of the will and they had an extended conversation about the cemetery's affairs. He testified in part: "Q. At that time, from your observation and from your conversation, what change, if any, was there in his mental conduct from the times that you had known him in Mercer County? A. Well I couldn't see any change that day at all, he was very clear, he recollected things that happened along our line of business in the Carpenter Cemetery that I had forgotten; he brought them up. . . . . . . Q. From your observation of him as to his conversation and actions generally that day, what was your conclusion as to his mental condition? A. Why I couldn't say anything but what it was good that day, I couldn't ask anything better; he outlined things there to me." The witness states that they discussed among other things the closing of a narrow road through the cemetery. He also testified: "A. Well there was some talk of other things, I don't just remember what all we did talk about. He spoke about his brother that lived out in the west, a brother that I should have known about but I had forgotten. I think the way he happened to do that we got to talking about his brother Thomas who lived in Mercer." Crediting this testimony, which was in no manner impeached, it is quite clear that on that day Mr. Munnell, the testator, was competent to make a will. The proponent, although interested, appeared to testify quite candidly, said her father's mind was clear on the attorney's last visit and also when he executed the will. Dr. Barr, the attending physician, expressed an opinion that testator was competent to make a will; although he had some months before made affidavit, in support of an application for increase of pension, in effect that Mr. Munnell was totally disabled mentally. A man may, however, be mentally so disabled as to have no earning capacity and yet be competent to make a will. Where the draftsman of the will is an at-

torney and acquainted with the testator and his opinion of capacity is supported by the subscribing witnesses, it makes a case for proponent which requires strong evidence to overcome: Phillip's Est., 299 Pa. 415; Kustus v. Hager et al., 269 Pa. 103, 111; Kane's Est., 206 Pa. 204.

Contestants submitted lay testimony and opinions of lay witnesses indicating lack of testamentary capacity. Some of these opinions were not based on the recital of any sufficient facts to render them of value. The most important testimony on behalf of contestants, however, was probably that of Dr. Lafferty, of Sharon, whose wife was one of Mr. Munnell's granddaughters. The doctor had occasionally visited the testator during and prior to 1928, but never treated him professionally, and expresses the opinion that Mr. Munnell did not "have sufficient mind and memory to know and understand the extent of his estate, and to intelligently dispose of same." There was testimony given by contestants and their witnesses, to the effect that testator's memory was exceedingly defective, that he would ask the same question again and again, that he failed to remember he was stockholder in a local water company, that he was incoherent in his speech, that he would fail to recognize acquaintances and even members of his family, that he became untidy and would spit tobacco juice on the floor, that he would at times expose his person when in his back yard, that he declared he had no property and received only twelve dollars a month pension, and other somewhat similar statements.

Beyond doubt, Mr. Munnell's health had broken and his faculties were greatly impaired. He was badly crippled, especially in his right hip, and walked with difficulty. He also had a distressing bladder trouble, which necessitated frequent visits to the toilet and probably explains the exposure of his person above mentioned, but, so far as appears, he never soiled his clothes. Like most old people, he was fond of discussing matters that

occurred years ago and of relating his army experiences, although he continued to read the daily paper. He was of a jovial disposition and some of his expressions were probably not intended seriously; for example, that his son, who was sitting in the room, with whom he had just been talking, had not been to see him in a year. Also his asking who Olive Aggas was, on reading her name as principal beneficiary in his will. This may have been because he uniformly called her "Dolly." Testator gave as a reason for not more liberally remembering his other children, that they had neglected him. While there is nothing to indicate any intentional neglect, they only visited him occasionally and it was natural he should, to some extent at least, favor the daughter who was devoting her life in making his last years comfortable. She gave him the constant care he required and did for him more than his housekeeper had been able to do. Taking the testimony as a whole, it will not, in view of our decisions, support a verdict against the will on the ground of lack of testamentary capacity. It is not a question whether some of the evidence, standing alone, would do so, but whether it would when considered as a whole: Leisey's Est., 280 Pa. 533; Tetlow's Est., 269 Pa. 486; Fleming's Est., 265 Pa. 399; Keller v. Lawson, 261 Pa. 489. Neither old age, nor its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of the right to dispose of his own property. A man's incidental statement that he had no property or that he did not know what he had, without more, throws but little light on the question of his testamentary capacity. See Eddey's App., 109 Pa. 406, 421. Mr. Justice KEPHART, speaking for the court, in Lawrence's Est., 286 Pa. 58, states, as summarized: "Old age, sickness, distress, debility of body, peculiar beliefs and opinions, incapacity to do business, partial failure of memory, neither prove nor raise a presumption of incapacity." The opinions of witnesses, lay or expert, as

to a testator's inability to make a will, are not of great force in face of the fact that he actually did make an intelligent disposition of his estate: Guar. T. & S. D. Co., Guar., v. Heidenreich et al., 290 Pa. 249; Snyder's Est., 279 Pa. 63; Draper's Est., 215 Pa. 314. There is no doubt that testator's mind was not what it had been and there is evidence that proponent had said her father had lost his mind. The evidence is that his mind was much clearer some days than others, and the question here is, what it was when he dictated and when he executed the will: Watmough's Est., 258 Pa. 22. While the real question is the condition of testator when he executed the will, yet evidence of his condition for a reasonable time, both before and after, was properly received as corroborative of his condition on the particular day: Rubins v. Hammett et al., 294 Pa. 295.

It requires less capacity to make a will than to do ordinary business: Snyder's Est., supra; Guar. T. & S. D. Co., Guar., v. Heidenreich, supra; Kustus v. Hager et al., supra; Guarantee Tr. & S. D. Co. v. Waller, 240 Pa. 575. "A person may be advanced in years and beset with the marked peculiarities of memory and conduct which so often accompany old age, yet if he appreciates, in a general way, who his relatives are, and what property he possesses, and indicates an intelligent understanding of the disposition he desires to make of it, he has testamentary capacity": Tetlow's Est., supra. See also Thompson v. Kyner, 65 Pa. 368.

There was in the instant case no such proof of general insanity as to cast upon proponent the burden of showing a lucid interval when the will was executed. See Harden v. Hays, 9 Pa. 151; Titlow v. Titlow, 54 Pa. 216; Hoope's Est., 174 Pa. 373. That he was sleepy and drowsy on some days and much brighter on others, indicated nothing abnormal. This is not uncommon in very old people. As stated by Mr. Justice TRUNKEY, speaking for the court, in Wilson v. Mitchell, 101 Pa. 495, 503: "Dougal [the testator] had lived over one hundred

years before he made the will, and his physical and mental weakness and defective memory were in striking contrast with their strength in the meridian of his life. He was blind; not deaf, but hearing impaired; his mind acted slowly; he was forgetful of recent events and especially of names, and repeated questions in conversation; and sometimes, when aroused from sleep or slumber, would seem bewildered. It is not singular that some of those who had known him when he was remarkable for vigor and intelligence, are of opinion that his reason was so far gone that he was incapable of making a will, although they never heard him utter an irrational expression." The will, in the instant case, may not be just, but a person of disposing mind may make an unjust will: Morgan's Est., 219 Pa. 355; Cauffman v. Long, 82 Pa. 72; Guar. T. & S. D. Co., Guar., v. Heidenreich, supra.

There is nothing in the record to sustain the contention of undue influence. While Mrs. Aggas lived with testator in his home, it does not appear that she endeavored to influence him in the disposition of his property. There was no wrong in the fact that she called in the attorney who drew the will. Being the woman about the house and testator's daughter, and he somewhat deaf and crippled, it was natural that she should do so: White's Est., 262 Pa. 356; see also Llewellyn's Est., 296 Pa. 74. It might be a circumstance that when the scrivener came Mr. Munnell asked his daughter how she desired the will drawn, but her answer that she wished him to make the will just as suited him indicates that she was not attempting to dictate the contents of the will. Her suggestion as to keeping quiet about the will was not unusual and we find nothing in the case to show undue influence. The circumstances, taken as a whole, do not create a presumption of such influence. See Keisler's Est., 213 Pa. 9. The undue influence must be such as to control the testator in the act of making the will: Tetlow's Est., supra; Keen's Est., 299

Pa. 430; Wolfe's Est., 284 Pa. 169; Gongaware et al., v. Donehoo et al., 255 Pa. 502; Herster v. Herster, 122 Pa. 239, 256. Furthermore, the proof fails to show a confidential relation between proponent and her father. Mere relationship does not create a presumption of confidential relation (Leedom et al. v. Palmer et ux., 274 Pa. 22; Vogan, Executor, v. Jordan, 92 Pa. Superior Ct. 519), nor does the fact that they resided in the same home, nor that she used his pension money, with his approval, for the support of the family, nor because she nursed him and attended to his wants, and there is practically nothing else. That she, a daughter, was preferred in the will raises no presumption against her as it might in case of a stranger: Caldwell v. Anderson, 104 Pa. 199, 206. She would be within her rights in urging him to make a will in her favor (Leisey's Est., supra; Koon's Est., 293 Pa. 465; Masterson v. Berndt, 207 Pa. 284; Trost v. Dingler, 118 Pa. 259), although there is no proof whatever that she in fact did so. Solicitations, however importunate, will not constitute undue influence: Englert v. Englert, 198 Pa. 326.

The proof taken as a whole does not support the finding of the jury on either or both questions stated in the issue; hence, judgment is hereby entered for the plaintiff, non obstante veredicto, and the record is ordered remitted that the issue may be set aside and the will probated. The costs to be paid by the appellees.