## Buchanan v. Pierie, Appellant.

*Will—Issue devisavit vel non—Belief in spiritualism—Delusions—Insanity.*

The will of one who believes in spiritualism is not on that account void, nor is it evidence of mental unsoundness. It must be shown in order to avoid a will on that account, that it was the offspring of such belief.

A will will not be set aside because the testator held to the conviction that he could through mediums communicate with the spirits of the departed, where it does not appear that he believed or admitted that he was influenced in any way by spirits in the preparation of his will.

Testator after providing for the comfort of his daughter and his housekeeper during their lives, in such a manner as to consume a large portion of the income of his estate, gave the entire remainder of his estate to an association of spiritualists. On the trial of an issue devisavit vel non, there was no testimony which questioned the general sanity of the testator, or which showed any lack of ability upon his part to conduct in an entirely rational and proper manner, the ordinary transactions of life ; nor was there any evidence that his belief in spiritualism in any way affected the making of his will ; nor was there any evidence of any delusion which affected the making of his will. There was evidence that father and daughter had frequent disagreements upon the subject of spiritualism, and that the daughter did not hesitate to express her contempt for his belief. Notwithstanding these disagreements the father continued to provide a house for his daughter and her family to live in. The daughter testified to a number of instances of queer and whimsical conduct on her father's part, but these instances were distributed through a period of about thirty years. Many of them occurred years before the will was made, and none of them were connected with its execution. *Held*, that the evidence was insufficient to sustain a verdict against the will.

Argued Jan. 9, 1903. Appeal, No. 168, Jan. T., 1902, by the First Association of Spiritualists of Philadelphia, from judgment of C. P., No. 5, Phila. Co., March T., 1901, No. 838,

on verdict for plaintiff in case of Martha Buchanan v. George
G. Pierie, Thomas A. Redding and T. Edwin Redding, Execu-
tors of Alexander McIlroy, Deceased; Henlen Laubach, a Leg-
atee, and the First Association of Spiritualists of Philadelphia,
Residuary Legatees. Before MITCHELL, DEAN, FELL, BROWN,
MESTREZAT and POTTER, JJ. Reversed.

Issue devisavit vel non. Before DAVIS, J.
The facts are stated in the opinion of the Supreme Court.
Verdict and judgment for plaintiff. Defendants appealed.

*Error assigned* amongst others was (10) refusal of binding
instructions for defendant.

*James Gay Gordon,* with him *W. H. R. Lukens,* for appel-
lants.—Belief in the doctrine of spiritualism is not evidence
of insanity and of consequent testamentary incapacity: Brown
v. Ward, 53 Md. 376; Rhoe's Will, 22 Misc. Rep. 415 (50 N.
Y. Supp. 392); McClary v. Stull, 62 N. W. Repr. 501; New-
ton v. Carbery, 5 Cr. C. C. 626; Johnson's Will, 59 N. Y.
Supp. 906; Williams v. Williams, 23 S. W. Repr. 789; Rogers's
Est., 2 Pa. C. C. Rep. 545.

A belief in metempsychosis is not an insane delusion: Bon-
ard's Will, 16 Abb. Pr. N. S. (N. Y.) 128.

A belief in the tenets of the Swedenborgian Church is not
an insane delusion: General Convention of New Jerusalem
Church v. Crocker, 7 Ohio Cir. Ct. 327.

A belief in Christian Science or faith cure is not evidence of
insanity: Addington v. Wilson, 5 Ind. 137.

A belief in witchcraft is not an insane delusion: Johnson v.
Johnson, 10 Ind. 387; Schildnecht v. Rompf, 4 S. W. Repr.
(Ky.) 235; Woodbury v. Obear, 73 Mass. 467; Thompson v.
Quimby, 2 Bradf. (N. Y.) 449; Van Guysling v. Van Kuren,
35 N. Y. 70; Leech v. Leech, 1 Phila. 244; Lee v. Lee, 4
McCord (S. Car.), 183.

*John G. Johnson,* for appellee.

OPINION BY MR. JUSTICE POTTER, February 23, 1903:
The will which is brought before us by the record in this
case does not bear upon its face any indication that it is the
product of an unbalanced mind. Upon the contrary, it shows

throughout the impress of a rational mind, possessed of clear and definite knowledge of the character and extent of the estate, and of the persons upon whom it is bestowed. In its various provisions, nothing appears which offends the reason or shocks the moral sense. It speaks rather in terms of thoughtful and considerate kindness. In the bequest to his daughter, the testator carefully provides for her a home so long as she lives, and an annual income, payable in equal monthly payments; and with rather minute attention to the details of her comfort directs that in addition, she shall be supplied with eight tons of coal annually, to be procured for her by his executors in the month of August of each year. He also provides that his burial lot in the cemetery shall be kept and used for the interment of himself and his daughter and her children. It is apparent from an inspection of the will that the testator was not unmindful of his parental relation, but that he made thoughtful and detailed provision for his daughter's welfare during her lifetime. In the same spirit, he provided a home and an annual income for the term of her life for his faithful servant and housekeeper, Mrs. Laubach, who had ministered to him for many years.

After thus providing for his daughter and for his housekeeper during their lives, he gives his entire estate to the First Association of Spiritualists of Philadelphia, to be applied to the purchase of a lot, and the erection of a building thereon, to be known as McIlroy Hall. In the event of the failure of the trustees of the association to act in this direction within three years after receiving the whole of his residuary estate, then the proceeds are to be applied to the establishment of a home for white protestant orphan children, to be called the McIlroy Institute.

The First Association of Spiritualists of Philadelphia, thus referred to, is a corporation of Pennsylvania, duly incorporated by the court of common pleas of Philadelphia county. It appears from the evidence, that the testator, Alexander McIlroy, executed this will upon July 20, 1880. He did not die until May 27, 1897, nearly seventeen years afterwards, having in the meantime added five codicils, the last of which was made upon March 11, 1897. By it he ratified the will and the second and third codocils thereof.

The will and its several codicils were duly admitted to probate by the register of wills, but at the instance of Martha Buchanan, the only daughter of the testator, an appeal was taken to the orphans' court, and an issue was thereafter awarded, and sent to the common pleas for trial, wherein Martha Buchanan was plaintiff, and the executors and the remaining legatees under the will were defendants.

The issue as framed involved an inquiry into the question of the general sanity of the testator, and also as to the exertion of undue influence in the making of the will, upon the part of certain persons called spiritualists.

But no evidence was offered which tended to show that any undue influence was exercised upon the testator by any living person, and this portion of the inquiry was therefore narrowed to what was incidental to the allegation of mental incapacity.

This it was contended, existed as the result of a delusion under which the testator rested, with regard to his daughter and her sons, which influenced him, and prejudiced him against them, in the making of his will. There was no testimony which questioned the general sanity of the testator, or which showed any lack of ability upon his part to conduct in an entirely rational and proper manner, the ordinary transactions of life.

In order to justify the setting aside of the will, upon the grounds submitted, there must be evidence, not merely that the testator was the victim of a delusion, but that he was controlled by the delusion in the making of his will, and was led by it to improperly disregard his daughter and her sons. Does the record show that there was any such evidence in this case? The estate seems to have been modest in amount, and the provision made by the testator for the comfort of his daughter and his housekeeper during their lives, would apparently consume a large portion of the income.

The contestant does not however regard with disfavor, these provisions of the will, nor does she seem to consider them as instigated by an insane delusion. It is the failure of the testator to give her the entire estate in fee, which she testifies, is in her opinion proof of his partial insanity.

This court in Taylor v. Trich, 165 Pa. 586, after citing authorities defining partial insanity, and discussing their application, said: "The question in any given case is therefore

whether the act under investigation, was done upon consideration of existing facts, or under the influence of a delusion that controlled the will of the doer and destroyed his freedom of action."

In the present case, the question is whether Alexander McIlroy was, at the time he made his will, subject to a delusion, amounting to partial insanity, which controlled him and prevented the free exercise of his judgment, it being alleged that the particular delusion to which he was subject, was an unfounded distrust of his daughter, and a feeling of ill will against her and her sons.

Unquestionably he was a believer in spiritualism. But there is abundance of authority for the proposition that mere belief in spiritualism, ghosts, dreams, etc., is not proof of insanity. There are many cases holding that without proof that such a belief resulted in some insane delusion, which prompted the act sought to be set aside, the act is valid however extreme or unreasonable the faith in spiritualism or other like beliefs.

In the Matter of Halbert, 15 Misc. Rep. (N. Y.) 308 (37 N. Y. Supp. 757), Surrogate COLLIER says: "Some evidence was given in reference to the religious belief of decedent. For many years she had been a spiritualist, and had done many things consistent with the teachings of spiritualism. She visited the cemetery, and communed with the spirits of her deceased husbands; set apart a bedroom for them in order that they might have a place to rest when they visited her; placed at the table a sufficient number of plates for them, and did numerous other things attributable, from this evidence, to her belief.

" We are not to treat spiritualism theologically, but legally, in its application to the testamentary capacity of the testatrix. It matters not what our individual opinion may be as to the facts, formalities or claims of spiritualism; that has nothing to do with this case. There is no evidence that decedent did things other than those which are understood to be the result of the teachings of spiritualism. There was no delusion which was the result of her belief which entered into the execution or preparation of this instrument. It is well settled that believers in this faith, when testamentary capacity is in question, must be considered in the same light as those who take part in any other religious ceremony."

In the Matter of Rohe, 22 Misc. Rep. (N. Y.) 415 (50 N. Y. Supp. 392), says Surrogate MARCUS on p. 418 : " The testimony offered by the contestants relating to the spiritualistic séances, when closely analyzed, seems to show nothing but the fact that the testatrix was a believer in spiritism. There is an entire absence of testimony as to the influence of spiritualism upon the particular disposition of her property as made by her. It must be conceded that the evidence proves conclusively that the testatrix was a believer in spiritism, but it in no way shows that her visits amongst the people with whom she came in contact at the time the séances were held, or the messages received by her from interested or disinterested persons, affected by the same belief, in any way induced her to make any disposition of her property in any particular or specified way, or in any way. It may be that some influence, by means of these séances, was obtained over her, but by whom, and to what purpose, is not shown. It may be that all these spiritualistic séances and messages were a scheme of deception and fraud, but there is no proof in the case which ought to support a judgment that such was a fact. . . . The will of one who believes in spiritism is not on that account void, nor is it evidence of mental unsoundness. It must be shown, in order to void a will on that account, that it was the offspring of such belief."

To the same effect is Keeler v. Keeler, 20 N. Y. St. Rep. 439 (3 N. Y. Supp. 629) and the cases are well summed up in Middleditch v. Williams, 45 N. J. Eq. 726 (17 Atl. Repr. 826), where the vice ordinary says (p. 735): " The testator's belief in spiritualism was not a morbid fancy, arising spontaneously in his mind, but a conviction produced by evidence. The proofs show that when he first commenced attending what are called séances, he was inclined to be skeptical; afterwards his mind seemed to be in an unstable condition, he sometimes believed and at others doubted, and that it was not until the spirits gave an extraordinary exposition of their power, . . . . that his last doubts as to the reality of the manifestations were removed. Believing, as I do, that these manifestations were correctly described by Vice Chancellor GIFFORD, in Lyon v. Home, L. R. 6 Eq. 655, 682, when he called them ' mischievous nonsense, well calculated, on the one hand, to delude the vain, the weak, the foolish and the superstitious ; and on the other,

to assist the projects of the needy and of the adventurer,' still, it seems to me to be entirely clear, that it cannot be said that a person who does believe in their reality, is, because of such belief, of unsound mind, or subject to an insane delusion.   No court has as yet so held.   No cases on this subject were cited on the argument.   Those which I have examined uniformly hold that a belief in spiritualism is not insanity.   The court, in Robinson v. Adams, 62 Me. 369, said: ' Belief in spiritualism is not insanity, nor an insane delusion. . . . The term "delusion" as applied to insanity, is not a mere mistake of fact, or the being misled by false testimony or statements to believe that a fact exists which does not exist.'   And in Brown v. Ward, 53 Md. 376, 393, it was said: ' The court cannot say, as a matter of law, that a person is insane because he holds the belief that he can communicate with spirits (of the dead), and can be and is advised and directed by them in his business transactions and the disposition of his property.'   Subsequently the same view was expressed in Otto v. Doty, 61 Iowa, 23 (15 N. W. Repr. 578), and also in the Matter of Smith's Will, 52 Wis. 543 (8 N. W. Repr. 616).   The utmost length to which any court has yet gone on this subject, is to declare that a belief in spiritualism may justify the setting aside of a will, when it is shown that the testator, through fear, dread, or reverence of the spirit with which he believed himself to be in communication, allowed his will and judgment to be overpowered, and, in disposing of his property, followed implicitly the directions which he believed the spirit gave him, but, in such case, the will is set aside, not on the ground of insanity, but of undue influence."

Turning again to the present case, we find from the testimony that while the testator held firmly to the conviction that he could through mediums communicate with the spirits of the departed, and particularly with the spirit of his dead son, yet it does not appear that he believed or ever admitted that he was influenced in any way by the spirits in the preparation of his will.   Neither at the time when the will was executed in 1880, nor when the various codicils were added from time to time, during a period of seventeen years thereafter, was there evidence that he claimed or admitted, that he was guided or controlled by the advice or suggestion of his spirit friends in the disposition of his estate.

But while it is not urged upon behalf of the contestant, that there is any direct evidence that any provision of the will was inserted at the instance of any one known as a spiritualist, or by reason of any communication to the testator from the spirit world, yet it is strongly urged that through his faith in the reality of such communications, and his daughter's contempt for any such belief, which excited his anger, the testator became imbued with an insane delusion concerning his daughter and her sons, which prejudiced him against them. But in so far as any such ill will existed, it can be accounted for upon perfectly natural grounds. The daughter admits frequent disagreements with her father upon the subject of spiritualism, and says that she did not hesitate to express her contempt for his belief, and that she sought to convince him of his credulity. Few parents are willing to meekly accept reproof and admonition from a son or daughter. But whatever these differences of opinion may have been, they were not very serious, for the testator continued to show the genuineness of his affection, in a most practical way, by providing a house for his daughter and her family to live in, and contributing for many years to their support.

The testimony does show that he was at times suspicious and irritable, and was subject to infirmities of temper. But the same may be said of many men who are not to be charged with partial insanity. In her evidence Mrs. Buchanan passes in review some thirty years of the life of her father. She recalls and recites a number of instances of queer and whimsical conduct on his part, during that long period of time. Told connectedly, and massed together, their effect is greatly heightened. But if it be remembered that in point of fact they were isolated instances, distributed through long years of a life indisputably sane and normal in its everyday aspects, they lose much of their force. Many of them occurred years before the will was made. None of them are connected with its execution, and during all the time in which the contestant alleges that there was a display of ill feeling upon the part of her father towards herself and her sons, she was being sheltered in the home which he had provided for her and her children, and was being supported by his bounty. She testifies that for years he gave her an allowance of $50.00 per month. And this out of

the modest pay of a night watchman.  With advancing years and increasing feebleness, and the loss of his own position, he was unable to maintain this allowance to her.  But the terms of his will and the careful provision he there made for her, are in total disaffirmance of the idea that he was under any delusion which induced any feeling of unkindness or ill will towards her.

He had provided for her during the years while her children were growing up, and when he made his will she was a woman in middle life, with a family of grown-up sons and a daughter.  Surely the testator may be pardoned if under these circumstances he felt that he had done his paternal duty.  Nor is there occasion for wonder, if after making further reasonable provision in his will for this same daughter and for his faithful housekeeper, he felt at liberty to indulge a desire to perpetuate his name through a bequest for the benefit of a belief, from whose teachings, however mistaken he may have been, he undoubtedly felt that he had received much comfort and consolation.

We find no ground for the assumption that the daughter was entitled to the whole of her father's estate in fee, and that his failure to give it to her was caused by an insane delusion, which made her the object of his ill will.

While the various assignments of error to the charge of the court may not be specifically sustained, yet a careful consideration of the evidence has satisfied us that as a whole it falls short of sustaining the allegations, either of testamentary incapacity or undue influence.

We think that under all the evidence in the case, the defendants were entitled to binding instructions in their favor.  The tenth assignment of error is therefore sustained, the judgment is reversed, and the issue is directed to be set aside.  The costs to be paid by the appellee.