# Smith's Estate.

*Wills—Issue devisavit vel non—Alleged mental incapacity of testator—Undue influence—Evidence—Refusal of issue.*

1. An issue devisavit vel non will not be granted on the ground of impaired mental faculties where the testimony in support of the issue goes no further than to show that the testator was a man abnormal in his tastes and habits, eccentric as to his walk, carriage and behaviour at table, high pitched as to voice, possessed of collections of indecent pictures, which he seemed to take pleasure in showing, and degenerate in his desires and inclinations, and where it affirmatively appears that up to the time of his death he was capable of transacting his affairs, involving the overseeing of a large estate, nearly all of which was invested.

2. Where in such a case the will contains a large bequest to a beneficiary, not of the family of the testator, and a provision making the scrivener of the will executor and residuary legatee, an issue devisavit vel non will not be granted on the ground of undue influence where it appears that such beneficiary was not present when the will and codicils were either drafted or executed, and did not know the scrivener at the time, and there is no evidence to show that he ever did unduly influence the decedent, and it further appears that the scrivener was chosen executor and residuary legatee by the testator as a voluntary and unsolicited act incidental to the making of the will; and neither the testator or the scrivener knew that the residue would be a substantial amount.

Argued May 6, 1915. Appeal, No. 114, Jan. T., 1915, by Ross Reynolds Smith, from decree of O. C. Philadelphia Co., July T., 1914, No. 99, dismissing petition for issues devisavit vel non in estate of Francis W. Smith, deceased. Before BROWN, C. J., MESTREZAT, ELKIN, STEWART and FRAZER, JJ. Appeal dismissed.

Appeal from decree of Register of Wills, refusing an issue devisavit vel non.

DALLETT, P. J., filed the following opinion:

By his will dated November 11, 1912, the testator, after directing the payment of his debts and funeral expenses and making provision for his funeral services and interment, gave $75,000 to the rector, church wardens and vestrymen of the Church of the Holy Trinity for the purposes of its endowment fund and as well directed that his pew in that church should be free forever as a memorial to his father P. Jenks Smith, $98,000 to the Seaside Home for Invalid Children at Atlantic City for the uses and purposes of that institution, and $2,000 for the founding of two free beds (one in memory of his sister, Margaretta Wilkinson Smith and the other in his own memory), $12,000 to the rector, church wardens and vestrymen of Grace Episcopal church, at Crosswicks, Burlington County, New Jersey, $25,000 to the rector, church wardens and vestrymen of the Church of the Holy Trinity "for the relief of the poor of the parish," $10,000 to the Western Temporary Home, $10,-000 to St. Joseph's Home for Homeless Boys, $6,000 to the Church Home for Children for two memorial foundations (one in memory of his sister, Margaretta Wilkinson Smith and the other in his own memory), $75,000 to his "dear friend" Samuel M. W. Briggs "as a token of my regard for him," $15,000 each to his cousins, Marion C. Smith, Ellen G. Smith and Mrs. James R. Hillyer, $1,000 to the East Park Nurseries, the income to be applied in the care of his lot in South Laurel Hill Cemetery and the placing of flowers thereon, $5,000 (less the amount of any indebtedness due by him) to Rodney Morison, $5,000 to the Pennsylvania Home Teaching Society and Free Circulating Library for the Blind, $5,000 to his friend, Reverend Charles Martin Niles, rector of Ascension church, Atlantic City (all said bequests to be free

of collateral inheritance tax) and gave the residue of his estate to his friend John F. Reardon absolutely.

By the first codicil dated April 22, 1913, he revoked his gift of $25,000 to the rector, church wardens and vestrymen of the Church of Holy Trinity "for the relief of the poor of the parish," and gave $10,000 to John F. Reardon directing that no further sum or allowances should be made him for his services as executor, and $25,000 to Samuel M. W. Briggs in addition to the gift of $75,000 by his will, and directed his executor to give the articles mentioned in a list which should be in the possession of his executor at the time of his death to the parties therein named.

By the second codicil dated June 12, 1913, he gave his new Packard automobile to Samuel M. W. Briggs and directed his executor to invest sufficient money to realize an income of $1,500 per annum which he gave to the said Samuel M. W. Briggs "to pay for keeping said automobile in first class condition and to meet the expenses of maintaining said car, as long as he keeps it in active service and use," and then provided as follows:

"I hereby revoke, and declare null and void the bequest of ninety-eight thousand dollars in bonds and mortgages in my said last will and testament to the Seaside Home for Invalid Children, Annapolis and Atlantic Avenues, Atlantic City, New Jersey.

"I give and bequeath to the Seaside Home for Invalid Children, Annapolis and Atlantic Avenues, Atlantic City, New Jersey, the sum of forty-five thousand dollars in bonds and mortgages.

"I give and bequeath to the Ascension church, Atlantic City, New Jersey, of which Rev. Charles Martin Niles is pastor, the sum of fifty-three thousand dollars in bonds and mortgages."

The testator died July 1, 1913, and left an estate worth approximately $430,000. His second codicil was not witnessed and his gifts thereby for charitable pur-

poses failed (Acts of April 26, 1855, Sec. 11, P. L. 328, and June 7, 1911, P. L. 702).

The will and both codicils were prepared by John F. Reardon, who is named as executor and residuary legatee. The will and first codicil were executed in one of a suite of offices occupied by the executor, the will itself being witnessed by William S. Stenger, Esq., and Horace L. Henderson, Esq., occupants of that suite, and the first codicil by Mr. Stenger and William H. Shoemaker, Esq., Mr. Shoemaker also being an occupant of the suite.

The testator had met and become acquainted with John F. Reardon who prepared the will and two codicils while calling upon his counsel Mr. Stenger. Reardon, according to the testimony, had also prepared a will for the testator in 1911 and the testator had subsequently consulted him with regard to making changes in that will. He also sent for Reardon to come to Atlantic City and prior to his death he authorized Reardon to go to the Fidelity Trust Company and remove bonds from his box in the safe deposit vault. In addition to this Reardon was an occupant of the suite presided over by the lawyer who had been counsel for the testator's father and who was his own counsel.

There is no evidence in the opinion of the judge who sat at the preliminary hearing in this case which establishes such a weakened condition of mind as would affect the testamentary capacity of this testator. He was peculiar but apparently he always had been, and he was tactful enough to conceal his misdoings from certain of his associates.

What then of undue influence?

In view of what has been said with regard to the testator's condition of mind there is in the opinion of the judge who heard the testimony no evidence to support the contention that Briggs unduly influenced the testator in the making of his will. He neither appears to

have had anything to do with the making of the will nor to have known anything about it.

It appears clearly from the testator's letter with regard to changes in the will of 1911 not only that the testator had for several years contemplated making Briggs a beneficiary but that Briggs did not know it. True it is that Miss Lowe testified that he declared to her that the testator was an "old fairy" and that he was "working him" and very probably he did devote his best efforts to obtain gifts from him not only in his lifetime but after his death as well. As long, however, as he did not by threats, fraud or undue flattery destroy the testator's free agency he might even have solicited them. As was said by Mr. Chief Justice GORDON in Trost v. Dingler, 118 Pa. 259, (p. 270):

"Solicitations, however importunate, cannot of themselves constitute undue influence; for though these may have a constraining effect, they do not destroy the testator's power to freely dispose of his estate."
And see Tawney v. Long, 76 Pa. 106, and Hindman v. Van Dyke, 153 Pa. 243.

With regard to Reardon the judge who heard the testimony has had more difficulty in reaching a conclusion. The testator had apparently determined that Mr. Stenger or some one connected with his office should be executor of his will. Mr. Stenger declined the office and he appointed Reardon but he also named him as residuary legatee.

What did he expect him to take as residuary legatee?

His estate has a gross value of approximately $431,-696.74. By his will he made bequests amounting to $374,000 and directed the payment of collateral inheritance tax thereon out of residuary estate making the total amount of legacies bequeated by his will $392,700.

He then by his first codicil transferred $25,000 from one legatee to another, and gave $10,000 to Reardon, ordering "that no further sum or allowance be made to

him for commissions for his work and trouble as executor in the settlement of my estate."

Had he believed that Reardon was to receive a considerable amount as residuary legatee why should he limit his compensation as executor to $10,000 or refer at all to what compensation he should receive? The reasonable inference is that he believed that he had by the legacies given by his will disposed of his entire estate.

He then by his second codicil provides for a trust fund of $1,500 per annum for the care of an automobile. Out of what? It is difficult to say—perhaps he found that the payment of his legacies would not take all he had or perhaps he did not believe the life of the automobile would be long, and by this same codicil he attempted to transfer exactly the same amount from one to two charitable legatees.

The conclusion is irresistible that the testator believed his gift of residue to have been unimportant—the gift of a "drip-pan" into which he expected little if anything to fall. But after legacies and taxes are paid and as well the accountant's compensation of $10,000 approximately $28,244.79, minus such counsel fees as may be allowed and plus very considerable income accumulating during the years succeeding his death, will pass as residue. This is a large sum in fact, but a small one when compared with the value of the entire estate. When the testator gave residue he must have known that he might be giving something. And there is no reason to believe that Reardon knew as much as the testator, if he knew anything about the value of the testator's estate.

Great stress was also laid upon the fact that the testator's last codicil was not attested by witnesses but the explanation that an attestation clause was furnished upon a separate sheet of paper and that the testator believed the witnesses who knew his signature would attest is at least plausible. And Reardon will gain nothing by the codicil for his counsel has formally established as

matter of record the fact that he will not make any claim under the second codicil which record must secure to the Seashore House for Invalid Children at Atlantic City the full amount of the legacy of ninety-eight thousand dollars given it by the testator's will: Price v. Maxwell, 28 Pa. 23; Teacle's Est., 153 Pa. 219, and Melville's Est., 245 Pa. 318.

The judge who sat at the preliminary hearing therefore concludes that notwithstanding the fact that a confidential relation did exist between the testator and Reardon and that Reardon wrote the will whereby he became the beneficiary of residuary estate the evidence does not disclose such weakness of mind as would warrant the granting of an issue to determine whether the testator's gift of residue was procured by either fraud or undue influence.

The fact that Briggs and Reardon both strangers in blood to the testator and both to benefit under his will did not know each other until subsequent to the making of the will and first codicil is worthy of note. They could not have conspired together, and neither would probably have been considerate of the interests of the other had the testator been subject to his individual influence.

It is also noticeable that not one of the testator's relatives took the witness stand during the four days of the trial to testify as to any weakness of mind or evidence of weakness of mind displayed by the testator at any time. Certainly they or some of them were in a position to know something of this old gentleman, and their interests were at stake.

Under all the circumstances the judge who sat at the preliminary hearing must conclude that if the evidence submitted before him were submitted to a jury and the jury should find a verdict against the validity of the testator's will that verdict would be set aside: McEnroe v. McEnroe, 201 Pa. 477; Caughey v. Bridenbaugh, 208 Pa. 414; Chidester's Est., 227 Pa. 560; Phillip's Est.,

244 Pa. 35; How's Est., 22 Pa. D. R. 322; Garett's Est., 22 Pa. D. R. 353.

In dismissing the exceptions to the findings of the president judge, the court, through LAMORELLE, J., filed the following opinion:

Assuming the truth of everything to which the witnesses for the contestant testify; that the decedent was a man abnormal in his tastes and habits, a quiet drinker, eccentric as to his walk, carriage and behaviour at table, high pitched as to voice, possessed of collections of indecent pictures, which he seemed to take pleasure in showing; degenerate in his desires and inclinations; none or all of them unfitted him for making a will, and this despite the fact that three eminent physicians called as experts said he was suffering from senile dementia; for two of them, on cross-examination, admitted that their opinion was liable to change if it was shown that decedent transacted his affairs involving the overseeing of an estate of $400,000, nearly all of which was invested; and it was affirmatively shown that up to the very time of his death he did thus conduct his business.

If one's mind and memory are sufficiently sound to know and understand the business in which one is engaged at the time of the execution of a will, that is all that is legally required.

The largest beneficiary under the will and codicils was not present when they were either drafted or executed, and there is not a shred of evidence to show that he ever did unduly influence the decedent. He was not even at the time known to the scrivener, nor did he come in contact with him until a short time before the decedent's death. And, even though there was testimony that, in the fall of 1911, he had stated that the decedent was an old fairy, that he was working him, that he knew what the decedent was after, and that presents were not given him "for nothing" this, in itself, would not be sufficient to sustain a verdict against the will on the ground of un-

due influence.  Opportunity is not enough; there must be testimony that such influence was exerted.

"Undoubtedly undue influence may so operate as to destroy a will, for in such case the testator is not a free agent; he becomes the mere implement of another's craft, and his testament that of the superior will.  But influence short of this is not what is technically known as 'undue influence'......but however it must, in order to avoid a will, destroy the free agency of the testator at the time and in the very act of making the testament. Solicitations, however importunate, cannot of themselves constitute undue influence; for though these may have a constraining effect, they do not destroy the testator's power to freely dispose of his estate:" Trost v. Dingler, 118 Pa. 259, at pages 269-270.

Nor was the scrivener, who is executor and residuary legatee, present at the time of the execution of the will. A well known and reputable member of the bar, who had for many years been counsel for the decedent, testified that the scrivener, who is employed in his office, came to him and told him that the decedent wished him, the scrivener, to prepare a will naming himself as executor. This was after the decedent himself had requested his counsel to act as executor, and, upon his declination, had informed him of his other selection.

We do not overlook the fact that the scrivener was present at the execution of the first codicil, but there were also present, as witnesses, decedent's own attorney and another attorney and office associate, of excellent character and reputation.  By this codicil, the scrivener received nothing; in fact, there is internal evidence that the decedent anticipated that there might not be any residuary estate; otherwise, fixing commissions at $10,000, necessarily payable from residue, is a meaningless and an idle provision.

So far as the second codicil is concerned, the uncontradicted testimony is that it was no fault of the scrivener that there were no attesting witnesses, as he himself

informed decedent that this codicil might be void because of such fact, and the decedent answered, in effect, that the witnesses to the first codicil might sign, and, if not, he would remedy that when he came to Philadelphia.

Undue influence, to affect a will, must be such as subjugates the mind of the testator to the will of the person operating upon it: Tawney v. Long, 76 Pa. 106; and an issue on the ground of undue influence is to be refused, where the most that can be found from the testimony is that there was an opportunity for its exercise: McNitt's Est., 229 Pa. 71.

"Of course," says Mr. Justice MOSCHZISKER in Phillip's Est., 244 Pa. 35, at page 46, "such influence may be ·shown by circumstantial evidence demonstrating a prior course of improper conduct calculated to produce an undue impression likely to remain and operate in the subsequent making of a will (Steadman v. Steadman, 10 Sadler 539); but it is not enough simply to prove a course of conduct, consistent with propriety, which afforded opportunities for undue influence (Tyson's Est., 223 Pa. 596)."

And when the effort is to establish undue influence without direct proof upon the point, "it cannot be made out by circumstances which, though to be expected if there was fraud, are equally consistent with its absence, and that such circumstances cannot, whether taken singly or collectively, justify an inference of wrongdoing" (from the opinion of the lower court, adopted by the Supreme Court, in Caughey v. Bridenbaugh, 208 Pa. 414, at page 423).

The testimony in the present case does not, in our judgment, bring it within the doctrine laid down in Armour's Est., 154 Pa. 517; Adam's Est., 220 Pa. 531, and, were it not for the earnest and able argument presented on behalf of the contestant, we might well have affirmed the decree, on the opinion of the learned hearing judge, but because of that argument, we have critically and at length reviewed all of the testimony, with-

out, however, finding anything which in our judgment would warrant submission to a jury.

The exceptions are dismissed.

*Error assigned* was in dismissing exceptions.

*William W. Porter,* with him, *C. Berkeley Taylor, Lewis Lawrence Smith, George D. Cameron,* and *C. Henry Stinson,* for appellant, cited: McHugh v. McHugh, 186 Pa. 197; Eckel v. Eckel, 49 N. J. Eq. 587; Hall v. Vanderpool, 156 Pa. 152; Brown v. Schock, 77 Pa. 471; Dean v. Negley, 41 Pa. 312; Snyder v. Erwin, 229 Pa. 644; Scattergood v. Kirk, 192 Pa. 263; Miller's Est., 179 Pa. 645.

*Alex. Simpson, Jr.,* with him *Carl M. Bowman,* for Samuel M. W. Briggs, appellee.

*James Gay Gordon,* with him *William S. Stenger,* for John F. Reardon, appellee.

PER CURIAM, May 26, 1915:

In view of the findings of the learned and careful president judge of the court below, the issue prayed for could not have been awarded. Those findings were approved by the entire court in passing upon the exceptions filed to them, and our review of the testimony has led us to the conclusion that they should not be disturbed. The appeal is dismissed, at appellant's costs, on the opinion of the court below dismissing the exceptions to the findings of the president judge.

Appeal dismissed.