Conway Will.

Argued January 4, 1951. Before DREW, C. J., STERN, STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

reargument refused April 9, 1951.

*Conrad A. Falvello,* with him *Thomas F. Farrell, Matthew Grayson,* and *Rocco C. Falvello,* for appellants.

*Arthur H. James,* with him *Andrew Hourigan, Jr.* and *Paul Bedford,* for appellees.

OPINION BY MR. CHIEF JUSTICE DREW, March 19, 1951:

This is an appeal from an order of the Orphans' Court of Luzerne County refusing to grant an issue devisavit vel non and dismissing an appeal from a decree of the Register of Wills of that County by which a writing purporting to be the last will of Philip J. Conway and dated October 21, 1947, was admitted to probate. Contestants in the court below, Helen Donnelly and Joseph Durkin, charged decedent lacked testamentary capacity and was subject to undue influence at the time he executed the will. These contentions are again offered as the basis for appeal by Joseph Durkin, the only contestant now before us.

Philip J. Conway, a bachelor, died December 12, 1947, while a patient at the Mercy Hospital in Wilkes-Barre, Pennsylvania. He was first stricken ill on November 5, 1945 and was confined, at that time, to the Pittston Hospital for a period of nine days. On November 19, 1945, he was admitted to Mercy Hospital where he remained until his death at the age of 80. His estate was inventoried at a sum in excess of $750,000 and his heirs at law were a brother, John Conway, of Ireland, and some nephews, nieces, grandnephews and grandnieces.

During his stay at Mercy Hospital, Conway executed two wills, the first of which was drawn up by his then attorney, William A. Valentine, Esq., and signed by Conway on December 20, 1945. In that will

he made several bequests to relatives and then named five charities as residuary legatees, to share equally. Although in the second will three of these charities were eliminated, and the shares of the other two reduced, none joined Joseph Durkin in this contest of the second will. Durkin was not named a beneficiary in either will. The last will was drawn by Leo White, Esq., at the request of Conway, and executed by him on October 21, 1947. By its terms the legacies provided by the earlier will were revoked and John Joyce, Margaret Horan Wright, John Durkin and Mary Durkin were substituted for the five charities as residuary legatees, to share equally.

At the hearing in the lower court contestant called fifteen witnesses; some testified to the physical condition of decedent, and some expressed an opinion that he did not have testamentary capacity. Of these witnesses three were doctors of medicine, two of whom had attended Conway in his illness and who based their conclusion on personal contact with him. Doctor Bruno, however, had not seen Conway since he left Pittston Hospital in 1945. Doctor Donnelly, who had been one of Conway's physicians at Mercy Hospital until dismissed by him in August, 1947, testified that Conway had capacity to execute codicils to his earlier will in March, 1946 and February, 1947 but could not make a will after February, 1946. By way of explanation, the witness stated that a codicil was only a "part will" and required less testamentary capacity than was necessary for the making of a will. Doctor Donnelly's opinion is therefore valueless.

Doctor Ornsteen, a neuro-psychiatrist, had never seen Conway but testified, in answer to a hypothetical question, that he did not think he had testamentary capacity on October 21, 1947. Since in resolving the questions posed by contestant we must consider all the

evidence, we say now that this medical expert's testimony is of little weight against the direct, factual evidence of disinterested witnesses who knew Conway: *Cookson's Estate,* 325 Pa. 81, 188 A. 904; *Phillips's Estate,* 299 Pa. 415, 149 A. 719.

The lay witnesses of contestant expressed different opinions as to when Conway lost testamentary capacity, and those most interested in having his property descend under our intestate laws, declared he did not have capacity even as early as when he made the first will in 1945. But they were substantially uniform in their description of Conway's appearance while at Mercy Hospital. All of them noticed that he had trouble with his eyes and that his mouth turned down; that he complained of pains in his chest and of headaches; that he was nervous, easily moved to tears and subject to a failing memory. They testified that he would frequently change the subject of conversation and would occasionally identify friends with places they had never been. During the last few months of his life, some of the witnesses stated, it became difficult to understand what Conway said and it was necessary to ask him to repeat. Some testified that Conway appeared to them to be confused, at times, on the details of a few of his business transactions. Some witnesses considered this a proper legal test of Conway's testamentary capacity, others were not aware of any precise test, while still others had only a vague idea of what the law requires as to mental capacity before one can make a will.

We entirely disagree with contestant that the facts presented here are sufficient to justify the conclusion of his witnesses that Conway lacked testamentary capacity on October 21, 1947. We have often held that old age, sickness, or debility of body neither prove nor raise a presumption of incapacity nor will inabil-

ity to transact business, physical weakness, or peculiar beliefs and opinions. See *Wilson v. Mitchell*, 101 Pa. 495; *Guarantee Tr. & S. D. Co. v. Waller*, 240 Pa. 575, 88 A. 13; *Higbee Will*, 365 Pa. 381; *Thompson v. Kyner*, 65 Pa. 368; *Buchanan v. Pierie*, 205 Pa. 123, 54 A. 583. Furthermore, as Mr. Justice KEPHART, speaking for this Court in *Lawrence's Estate*, 286 Pa. 58, 132 A. 786, stated (p. 65) : "Failure of memory does not prove incapacity unless it is total or so extended as to make incapacity practically certain. A testator may not be able at all times to recollect the names of persons or families of those with whom he has been intimately acquainted. He may ask idle questions and repeat himself, and yet his understanding of the ordinary transactions of his life may be sound. He may not have the strength and vigor of a man able to digest all the parts of a contract, yet he may be competent to distribute his property by will." A review of the voluminous record in the instant case has convinced us that contestant's witnesses have failed to establish a course of conduct which, under our rulings, could support an opinion that Conway lacked testamentary capacity. This is particularly striking when we consider the testimony of the two witnesses who were in charge of Conway's business affairs until discharged by him and who were undoubtedly in the best position of all of contestant's witnesses to judge the testamentary capacity of decedent on October 21, 1947. Although they stated that Conway did not have capacity as of that date, they nevertheless admitted, upon cross-examination, that they never failed to follow his instructions as to the handling of his affairs after the date they now swear he became incompetent to make a will. Proponents submitted documentary evidence, covering a two-year period from December 1945 to December, 1947, the month Conway died, which disclosed

the occurrence of a considerable number of business transactions directed by Conway and obediently executed by these witnesses. Of particular importance is a letter to Conway, sent by one of these witnesses, dated November 12, 1947, and containing a bill for services rendered from December 31, 1945 to September 30, 1947. The bill was paid and papers then in the witnesses' possession were turned over to Leo White, Esq., in accordance with earlier instructions of Conway. It is apparent that whatever opinion these witnesses might now have as to Conway's testamentary capacity on October 21, 1947, they had no doubts at that time, of his ability to do business and, in view of our often repeated holding that less capacity is required to make a will than to transact business, their present opinion is worthless: *Sturgeon Will,* 357 Pa. 75, 53 A. 2d 139; *Smith's Estate,* 250 Pa. 67, 95 A. 338; *Gongaware v. Donehoo,* 255 Pa. 502, 100 A. 264.

Contestant's evidence as to Conway's testamentary capacity is weak and insufficient to support his case. Proponents' evidence, on the other hand, is strong and convincing. Six of proponents' witnesses were hospital personnel who were either in daily attendance upon Conway or saw him almost every day for a year prior to his death, and all testified that decedent had testamentary capacity as of October 21, 1947. Two of these six were Conway's physicians who also signed the will October 21, 1947, as subscribing witnesses. An additional witness to the competency of decedent was the attorney who drew that will, Mr. White. After a review and due consideration of contestant's evidence this testimony, without more, would suffice to support the will of 1947 for, as we have often said, where the draftsman of the will is an attorney, acquainted with the testator, and his opinion of capacity is supported by the subscribing witnesses, a case is made for pro-

ponent which requires strong evidence to overcome: *Aggas v. Munnell,* 302 Pa. 78, 84, 152 A. 840, and the cases there cited. Contestant's attempts to discredit this testimony on the grounds that the witnesses, because of their official connections with Mercy Hospital, were interested in sustaining the will, is unconvincing in view of the fact that, under the terms of Conway's earlier will, Mercy Hospital would have received, as a residuary legatee, approximately fifteen times as much money as was bequeathed to it in the second will. In addition to the oral testimony introduced on proponents' behalf, the documentary evidence, referred to above, was offered to show the attitude of those who had business dealings with Conway at the time the will of 1947 was executed. These papers add great weight to proponents' other testimony, and make it strikingly clear that the record contains more than ample factual evidence to sustain the hearing judge's conclusion that Conway had testamentary capacity when he made this last will and testament.

Contestant has also insisted that Conway was subjected to the undue influence, in the execution of the will of October 21, 1947, of the scrivener of the will, Leo White, Esq., three of the four residuary legatees, John Joyce, Mary and John Durkin, and of Judge ANDREW HOURIGAN. He has alleged that the imposition of such influence was the result of a conspiracy on the part of these individuals to make the Durkins and Joyces residuary legatees under Conway's will and that, because of his weakened mental condition, Conway was not able to resist their concerted persuasions. However, there is not a single shred of evidence in the record to support this contention. It seems incredible that any responsible person would make such charges without substantial proof to support them. Judge

HOURIGAN was an infrequent visitor to Conway's hospital room, was not present there when the will was discussed or executed, and did not know any of the residuary legatees. The scrivener, Mr. White, knew only one of the legatees, John Joyce, but had not had occasion to speak to him for a period of five years. Although Mary and John Durkin visited Conway approximately once a week, neither they nor Joyce were present when decedent's testamentary wishes were made known to the scrivener nor when the will was executed. Neither is there the slightest evidence that they said or did anything at any time to prompt Conway to make a new will or to influence him in the disposition of his property. In view of this evidence contestant's allegation is preposterous for it is patently clear that these parties never exerted any influence upon Conway.

Realizing the unsoundness of this argument, contestant himself has not pressed it too strenuously but has preferred to stand on inferences of confidential relationship and undue influence on the part of Judge HOURIGAN and others which he has drawn from the facts that Judge HOURIGAN is President of Mercy Hospital, that several of proponents' witnesses are employees of that hospital and that the hospital received a bequest of $10,000 under the will. It is further argued that, since White was a former law associate of Judge HOURIGAN and is now executor under the will, and that Judge HOURIGAN'S son is now attorney for the estate, it can reasonably be inferred that Judge HOURIGAN and White persuaded Conway to write the new will. The absurdity of these propositions is so clear from the record, that, if it were not for the stress that contestant places upon them, they would not warrant any discussion whatsoever. The first contention is totally without merit not only because of what has

already been said about the casual acquaintanceship of Judge HOURIGAN and testator, but also because none of the employee-witnesses benefited directly or indirectly under any of the provisions of the later will. Furthermore Mercy Hospital would be in a far more desirable position under the terms of the will of December 20, 1945, than under the 1947 will. For, under that prior will, as pointed out earlier in this opinion, Mercy Hospital was named one of five residuary legatees which would have entitled it to a sum of almost $150,000 as compared to the $10,000 it can now claim under the 1947 will. The second contention is equally unsound since White was known to Conway whom he had represented on two other occasions; his name was mentioned by Judge HOURIGAN along with those of several other attorneys in response to Conway's request and, finally, there is no evidence to show that any pressure was exerted on Conway to choose White. Nor has he benefited directly or indirectly in any way from the execution of the will other than to be named executor and we have held before that this does not give rise to a presumption of undue influence on the part of the named executor: *Wetzel v. Edwards,* 340 Pa. 121, 124, 16 A. 2d 441.

A review of all the evidence in this very long record has convinced us that any verdict of a jury against the validity of this will would have to be set aside. The learned court below therefore properly refused to grant an issue devisavit vel non: *Ross Will,* 355 Pa. 112, 49 A. 2d 392; *Sturgeon Will,* supra.

Order affirmed; costs to be paid by appellant.